# UNITED STATES *v.* HENSLEY

No. 83–1330.   Argued November 5, 1984—Decided January 8, 1985

222

O'CONNOR, J., delivered the opinion for a unanimous Court.    BRENNAN, J., filed a concurring opinion, *post,* p. 236.

*Kathryn A. Oberly* argued the cause for the United States. With her on the briefs were *Solicitor General Lee, Assistant Attorney General Trott, Deputy Solicitor General Frey,* and *Joel M. Gershowitz.*

*Edward G. Drennen* argued the cause and filed a brief for respondent.

JUSTICE O'CONNOR delivered the opinion of the Court.

We granted certiorari in this case, 467 U. S. 1203 (1984), to determine whether police officers may stop and briefly detain a person who is the subject of a "wanted flyer" while they attempt to find out whether an arrest warrant has been issued. We conclude that such stops are consistent with the Fourth Amendment under appropriate circumstances.

## I

On December 4, 1981, two armed men robbed a tavern in the Cincinnati suburb of St. Bernard, Ohio. Six days later, a St. Bernard police officer, Kenneth Davis, interviewed an informant who passed along information that respondent Thomas Hensley had driven the getaway car during the armed robbery. Officer Davis obtained a written statement from the informant and immediately issued a "wanted flyer" to other police departments in the Cincinnati metropolitan area.

The flyer twice stated that Hensley was wanted for investigation of an aggravated robbery. It described both Hensley and the date and location of the alleged robbery, and asked other departments to pick up and hold Hensley for the St. Bernard police in the event he were located. The flyer also warned other departments to use caution and to consider Hensley armed and dangerous.

The St. Bernard Police Department's "wanted flyer" was received by teletype in the headquarters of the Covington Police Department on December 10, 1981. Covington is a Kentucky suburb of Cincinnati that is approximately five miles from St. Bernard. The flyer was read aloud at each change of shift in the Covington Police Department between December 10 and December 16, 1981. Some of the Covington officers were acquainted with Hensley, and after December 10 they periodically looked for him at places in Covington he was known to frequent.

On December 16, 1981, Covington Officer Terence Eger saw a white Cadillac convertible stopped in the middle of a

Covington street. Officer Eger saw Hensley in the driver's seat and asked him to move on. As Hensley drove away, Eger inquired by radio whether there was a warrant outstanding for Hensley's arrest. Before the dispatcher could answer, two other Covington officers who were in separate cars on patrol interrupted to say that there might be an Ohio robbery warrant outstanding on Hensley. The officers, Daniel Cope and David Rassache, subsequently testified that they had heard or read the St. Bernard flyer on several occasions, that they recalled that the flyer sought a stop for investigation only, and that in their experience the issuance of such a flyer was usually followed by the issuance of an arrest warrant. While the dispatcher checked to see whether a warrant had been issued, Officer Cope drove to a Holman Street address where Hensley occasionally stayed, and Officer Rassache went to check a second location.

The dispatcher had difficulty in confirming whether a warrant had been issued. Unable to locate the flyer, she called the Cincinnati Police Department on the mistaken belief that the flyer had originated in Cincinnati. The Cincinnati Police Department transferred the call to its records department, which placed the dispatcher on hold. In the meantime, Officer Cope reported that he had sighted a white Cadillac approaching him on Holman Street. Cope turned on his flashing lights and Hensley pulled over to the curb. Before Cope left his patrol car, the dispatcher advised him that she had "Cincinnati hunting for the warrant," App. 49, but that she had not yet confirmed it. Cope approached Hensley's car with his service revolver drawn and pointed into the air. He had Hensley and a passenger seated next to him step out of the car.

Moments later, Officer Rassache arrived in his separate car. He recognized the passenger, Albert Green, a convicted felon. Rassache stepped up to the open passenger door of Hensley's car and observed the butt of a revolver protruding from underneath the passenger's seat. Green

was then arrested. A search of the car uncovered a second handgun wrapped in a jacket in the middle of the front seat and a third handgun in a bag in the back seat. After the discovery of these weapons, Hensley was also arrested.

After state handgun possession charges against Hensley were dismissed, Hensley was indicted by a federal grand jury in the Eastern District of Kentucky for being a convicted felon in possession of firearms in violation of 18 U. S. C. App. § 1202(a)(1). Hensley moved to suppress the handguns from evidence on the grounds that the Covington police had impermissibly stopped him in violation of the Fourth Amendment and the principles announced in *Terry* v. *Ohio*, 392 U. S. 1 (1968). The District Judge held the stop to be proper and denied the motion. Respondent was convicted after a bench/ trial and sentenced to two years in federal prison.

The United States Court of Appeals for the Sixth Circuit reversed the conviction. 713 F. 2d 220 (1983). The panel noted that the Covington police could not justifiably conclude from the St. Bernard flyer that a warrant had been issued for Hensley's arrest; nor could the Covington police stop the respondent while they attempted to find out whether a warrant had in fact been issued. Reviewing this Court's decisions applying *Terry*, the Sixth Circuit concluded that investigative stops remain a narrow exception to the probable-cause requirement, and that this Court has manifested a "clear intention to restrict investigative stops to settings involving the investigation of ongoing crimes." 713 F. 2d, at 225. Since Covington police encountered Hensley almost two weeks after the armed robbery in St. Bernard, they had no reason to believe they were investigating an ongoing crime. Because the Covington police were familiar only with the St. Bernard flyer, and not with the specific information which led the St. Bernard police to issue the flyer, the Court of Appeals held they lacked a reasonable suspicion sufficient to justify an investigative stop. The Court of Appeals concluded that Hensley's conviction rested on evidence obtained

through an illegal arrest, and therefore had to be reversed. We disagree, and now reverse.

## II

The Fourth Amendment protects the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures. In *Terry, supra,* and subsequent cases, this Court has held that, consistent with the Fourth Amendment, police may stop persons in the absence of probable cause under limited circumstances. See *Dunaway* v. *New York,* 442 U. S. 200, 207–211 (1979). In particular, the Court has noted that law enforcement agents may briefly stop a moving automobile to investigate a reasonable suspicion that its occupants are involved in criminal activity. See *United States* v. *Brignoni-Ponce,* 422 U. S. 873, 881 (1975) (within United States borders, Government interest in preventing illegal entry of aliens permits a *Terry* stop on reasonable suspicion that particular vehicle contains aliens). Although stopping a car and detaining its occupants constitute a seizure within the meaning of the Fourth Amendment, the governmental interest in investigating an officer's reasonable suspicion, based on specific and articulable facts, may outweigh the Fourth Amendment interest of the driver and passengers in remaining secure from the intrusion. See *Delaware* v. *Prouse,* 440 U. S. 648, 653–655 (1979).

In this case, the Sixth Circuit announced two prerequisites to such an investigatory stop and held that they were lacking: first, the crime being investigated was not imminent or ongoing, but rather was already completed; second, the "wanted flyer" was insufficient to create a reasonable suspicion that respondent had engaged in criminal activity. If either part of this analysis is correct, then it was indeed improper to stop respondent, and his conviction cannot stand. We accordingly turn to the separate but related issues of *Terry* stops to investigate completed crimes and *Terry* stops in reliance on another police department's "wanted flyer."

## A

This is the first case we have addressed in which police stopped a person because they suspected he was involved in a completed crime. In our previous decisions involving investigatory stops on less than probable cause, police stopped or seized a person because they suspected he was about to commit a crime, *e. g., Terry, supra,* or was committing a crime at the moment of the stop, *e. g., Adams* v. *Williams,* 407 U. S. 143 (1972). Noting that *Florida* v. *Royer,* 460 U. S. 491 (1983), struck down a particularly intrusive detention of a person suspected of committing an ongoing crime, the Court of Appeals in this case concluded that we clearly intended to restrict investigative stops to the context of ongoing crimes.

We do not agree with the Court of Appeals that our prior opinions contemplate an inflexible rule that precludes police from stopping persons they suspect of past criminal activity unless they have probable cause for arrest. To the extent previous opinions have addressed the issue at all, they have suggested that some investigative stops based on a reasonable suspicion of past criminal activity could withstand Fourth Amendment scrutiny. Thus *United States* v. *Cortez,* 449 U. S. 411, 417, n. 2 (1981), indicates in a footnote that "[o]f course, an officer may stop and question a person if there are reasonable grounds to believe that person is wanted for past criminal conduct." And in *United States* v. *Place,* 462 U. S. 696 (1983), decided barely a month before the Sixth Circuit's opinion, this Court stated that its prior opinions acknowledged police authority to stop a person "when the officer has reasonable, articulable suspicion that the person *has been,* is, or is about to be engaged in criminal activity." *Id.,* at 702 (emphasis added). See also *Michigan* v. *Summers,* 452 U. S. 692, 699, and n. 7 (1981). Indeed, *Florida* v. *Royer* itself suggests that certain seizures are justifiable under the Fourth Amendment even in the absence of probable cause "if there is articulable suspicion that a person *has committed* or is about to commit a crime." 460 U. S., at 498 (plurality opinion) (emphasis added).

At the least, these dicta suggest that the police are not automatically shorn of authority to stop a suspect in the absence of probable cause merely because the criminal has completed his crime and escaped from the scene. The precise limits on investigatory stops to investigate past criminal activity are more difficult to define. The proper way to identify the limits is to apply the same test already used to identify the proper bounds of intrusions that further investigations of imminent or ongoing crimes. That test, which is grounded in the standard of reasonableness embodied in the Fourth Amendment, balances the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion. *United States* v. *Place, supra,* at 703; *Michigan* v. *Summers, supra,* at 698–701. When this balancing test is applied to stops to investigate past crimes, we think that probable cause to arrest need not always be required.

The factors in the balance may be somewhat different when a stop to investigate past criminal activity is involved rather than a stop to investigate ongoing criminal conduct. This is because the governmental interests and the nature of the intrusions involved in the two situations may differ. As we noted in *Terry,* one general interest present in the context of ongoing or imminent criminal activity is "that of effective crime prevention and detection." *Terry,* 392 U. S., at 22. A stop to investigate an already completed crime does not necessarily promote the interest of crime prevention as directly as a stop to investigate suspected ongoing criminal activity. Similarly, the exigent circumstances which require a police officer to step in before a crime is committed or completed are not necessarily as pressing long afterwards. Public safety may be less threatened by a suspect in a past crime who now appears to be going about his lawful business than it is by a suspect who is currently in the process of violating the law. Finally, officers making a stop to investigate past crimes may have a wider range of opportunity to

choose the time and circumstances of the stop. See *Brown v. Texas*, 443 U. S. 47, 51 (1979); ALI Model Code of Pre-Arraignment Procedure 12 (Prop. Off. Draft No. 1, 1972).

Despite these differences, where police have been unable to locate a person suspected of involvement in a past crime, the ability to briefly stop that person, ask questions, or check identification in the absence of probable cause promotes the strong government interest in solving crimes and bringing offenders to justice. Restraining police action until after probable cause is obtained would not only hinder the investigation, but might also enable the suspect to flee in the interim and to remain at large. Particularly in the context of felonies or crimes involving a threat to public safety, it is in the public interest that the crime be solved and the suspect detained as promptly as possible. The law enforcement interests at stake in these circumstances outweigh the individual's interest to be free of a stop and detention that is no more extensive than permissible in the investigation of imminent or ongoing crimes.

We need not and do not decide today whether *Terry* stops to investigate all past crimes, however serious, are permitted. It is enough to say that, if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion. The automatic barrier to such stops erected by the Court of Appeals accordingly cannot stand.

### B

At issue in this case is a stop of a person by officers of one police department in reliance on a flyer issued by another department indicating that the person is wanted for investigation of a felony. The Court of Appeals concluded that "the Fourth Amendment does not permit police officers in one department to seize a person simply because a neighboring

police department has circulated a flyer reflecting the desire to question that individual about some criminal investigation that does not involve the arresting officers or their department." 713 F. 2d, at 225. This holding apparently rests on the omission from the flyer of the specific and articulable facts which led the first department to suspect respondent's involvement in a completed crime. *Ibid.*

This Court discussed a related issue in *Whiteley* v. *Warden*, 401 U. S. 560 (1971). In *Whiteley*, a county sheriff in Wyoming obtained an arrest warrant for a person suspected of burglary. The sheriff then issued a message through a statewide law enforcement radio network describing the suspect, his car, and the property taken. At least one version of the message also indicated that a warrant had been issued. *Id.*, at 564, and n. 5. The message did not specify the evidence that gave the sheriff probable cause to believe the suspect had committed the breaking and entering. In reliance on the radio message, police in Laramie stopped the suspect and searched his car. The Supreme Court, in an opinion by Justice Harlan, ultimately concluded that the sheriff had lacked probable cause to obtain the warrant and that the evidence obtained during the search by the police in Laramie had to be excluded. In so ruling, however, the Court noted:

> "We do not, of course, question that the Laramie police were entitled to act on the strength of the radio bulletin. Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause. Where, however, the contrary turns out to be true, an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest." *Id.*, at 568.

This language in *Whiteley* suggests that, had the sheriff who issued the radio bulletin possessed probable cause for

arrest, then the Laramie police could have properly arrested the defendant even though they were unaware of the specific facts that established probable cause. See *United States* v. *Maryland*, 479 F. 2d 566, 569 (CA5 1973). Thus *Whiteley* supports the proposition that, when evidence is uncovered during a search incident to an arrest in reliance merely on a flyer or bulletin, its admissibility turns on whether the officers who *issued* the flyer possessed probable cause to make the arrest. It does not turn on whether those relying on the flyer were themselves aware of the specific facts which led their colleagues to seek their assistance. In an era when criminal suspects are increasingly mobile and increasingly likely to flee across jurisdictional boundaries, this rule is a matter of common sense: it minimizes the volume of information concerning suspects that must be transmitted to other jurisdictions and enables police in one jurisdiction to act promptly in reliance on information from another jurisdiction.

Neither respondent nor the Court of Appeals suggests any reason why a police department should be able to act on the basis of a flyer indicating that another department has a warrant, but should not be able to act on the basis of a flyer indicating that another department has a reasonable suspicion of involvement with a crime. Faced with this precise issue, the Court of Appeals for the Ninth Circuit applied *Whiteley* and concluded that, although the officer who issues a wanted bulletin must have a reasonable suspicion sufficient to justify a stop, the officer who acts in reliance on the bulletin is not required to have personal knowledge of the evidence creating a reasonable suspicion. *United States* v. *Robinson*, 536 F. 2d 1298, 1300 (1976). The Ninth Circuit there noted "that effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information." *Id.*, at 1299.

It could be argued that police can more justifiably rely on a report that a magistrate has issued a warrant than on a report that another law enforcement agency has simply concluded that it has a reasonable suspicion sufficient to authorize an investigatory stop. We do not find this distinction significant. The law enforcement interests promoted by allowing one department to make investigatory stops based upon another department's bulletins or flyers are considerable, while the intrusion on personal security is minimal. The same interests that weigh in favor of permitting police to make a *Terry* stop to investigate a past crime, *supra,* at 229, support permitting police in other jurisdictions to rely on flyers or bulletins in making stops to investigate past crimes.

We conclude that, if a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification, see *United States ex rel. Kirby* v. *Sturges,* 510 F. 2d 397, 400–401 (CA7) (Stevens, J.), cert. denied, 421 U. S. 1016 (1975), to pose questions to the person, or to detain the person briefly while attempting to obtain further information. See *Adams* v. *Williams,* 407 U. S. 143, 146 (1972) ("A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be the most reasonable in light of the facts known to the officer at the time"). If the flyer has been issued in the absence of a reasonable suspicion, then a stop in the objective reliance upon it violates the Fourth Amendment. In such a situation, of course, the officers making the stop may have a good-faith defense to any civil suit. See *Scheuer* v. *Rhodes,* 416 U. S. 232 (1974); *Pierson* v. *Ray,* 386 U. S. 547 (1967); *Turner* v. *Raynes,* 611 F. 2d 92, 93 (CA5) (officer relying in good faith on an invalid arrest warrant has defense to civil suit), cert. denied, 449 U. S. 900 (1980). It is the objective reading of the flyer or bulletin that determines whether other

police officers can defensibly act in reliance on it. Cf. *Terry*, 392 U. S., at 21–22 ("it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?"). Assuming the police make a *Terry* stop in objective reliance on a flyer or bulletin, we hold that the evidence uncovered in the course of the stop is admissible if the police who *issued* the flyer or bulletin possessed a reasonable suspicion justifying a stop, *United States v. Robinson, supra,* and if the stop that in fact occurred was not significantly more intrusive than would have been permitted the issuing department.

## III

It remains to apply the two sets of principles described above to the stop and subsequent arrest of respondent Hensley.

At the outset, we assume, *arguendo,* that the St. Bernard police who issued the "wanted flyer" on Hensley lacked probable cause for his arrest. The District Court implied that the St. Bernard police had probable cause for arrest, but held only that the St. Bernard officers had reasonable suspicion sufficient to justify a stop. App. to Pet. for Cert. 14a. The Court of Appeals implied that probable cause might be lacking, 713 F. 2d, at 223, but ultimately concluded that the question was irrelevant because the Covington police would not be entitled to make an arrest or a stop regardless of whether the St. Bernard police possessed probable cause or a reasonable suspicion. In this Court, no party contends that the St. Bernard police had probable cause to arrest Hensley.

We agree with the District Court that the St. Bernard police possessed a reasonable suspicion, based on specific and articulable facts, that Hensley was involved in an armed robbery. The District Judge heard testimony from the St. Bernard officer who interviewed the informant. On the strength of the evidence, the District Court concluded

that the wealth of detail concerning the robbery revealed by the informant, coupled with her admission of tangential participation in the robbery, established that the informant was sufficiently reliable and credible "to arouse a reasonable suspicion of criminal activity by [Hensley] and to constitute the specific and articulable facts needed to underly a stop." App. to Pet. for Cert. 14a. Under the circumstances, "the information carried enough indicia of reliability," *Adams* v. *Williams, supra,* at 147, to justify an investigatory stop of Hensley.

The justification for a stop did not evaporate when the armed robbery was completed. Hensley was reasonably suspected of involvement in a felony and was at large from the time the suspicion arose until the stop by the Covington police. A brief stop and detention at the earliest opportunity after the suspicion arose is fully consistent with the principles of the Fourth Amendment.

Turning to the flyer issued by the St. Bernard police, we believe it satisfies the objective test announced today. An objective reading of the entire flyer would lead an experienced officer to conclude that Thomas Hensley was at least wanted for questioning and investigation in St. Bernard. Since the flyer was issued on the basis of articulable facts supporting a reasonable suspicion, this objective reading would justify a brief stop to check Hensley's identification, pose questions, and inform the suspect that the St. Bernard police wished to question him. As an experienced officer could well assume that a warrant might have been obtained in the period after the flyer was issued, we think the flyer would further justify a brief detention at the scene of the stop while officers checked whether a warrant had in fact been issued. It is irrelevant whether the Covington officers intended to detain Hensley only long enough to confirm the existence of a warrant, or for some longer period; what matters is that the stop and detention that occurred were

in fact no more intrusive than would have been permitted an experienced officer on an objective reading of the flyer.

To be sure, the St. Bernard flyer at issue did not request that other police departments briefly detain Hensley merely to check his identification or confirm the existence of a warrant. Instead, it asked other departments to pick up and hold Hensley for St. Bernard. Our decision today does not suggest that such a detention, whether at the scene or at the Covington police headquarters, would have been justified. Given the distance involved and the time required to identify and communicate with the department that issued the flyer, such a detention might well be so lengthy or intrusive as to exceed the permissible limits of a *Terry* stop. See *United States* v. *Place*, 462 U. S., at 709. Nor do we mean to endorse St. Bernard's request in its flyer for actions that could forseeably violate the Fourth Amendment. We hold only that this flyer, objectively read and supported by a reasonable suspicion on the part of the issuing department, justified the length and intrusiveness of the stop and detention that actually occurred.

When the Covington officers stopped Hensley, they were authorized to take such steps as were reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop. The Covington officers' conduct was well within the permissible range in the context of suspects who are reported to be armed and dangerous. See *Michigan* v. *Long*, 463 U. S. 1032, 1049–1050 (1983); *Pennsylvania* v. *Mimms*, 434 U. S. 106, 110–111 (1977) *(per curiam)*. Having stopped Hensley, the Covington police were entitled to seize evidence revealed in plain view in the course of the lawful stop, to arrest Hensley's passenger when evidence discovered in plain view gave probable cause to believe the passenger had committed a crime, *Texas* v. *Brown*, 460 U. S. 730 (1983) (plurality opinion), and subsequently to search the passenger compartment of the car because it was within the passenger's immediate control. *New York*

v. *Belton,* 453 U. S. 454 (1981). Finally, having discovered additional weapons in Hensley's car during the course of a lawful search, the Covington officers had probable cause to arrest Hensley himself for possession of firearms.

The length of Hensley's detention from his stop to his arrest on probable cause was brief. A reasonable suspicion on the part of the St. Bernard police underlies and supports their issuance of the flyer. Finally, the stop that occurred was reasonable in objective reliance on the flyer and was not significantly more intrusive than would have been permitted the St. Bernard police. Under these circumstances, the investigatory stop was reasonable under the Fourth Amendment, and the evidence discovered during the stop was admissible.

The judgment of the Court of Appeals is reversed, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BRENNAN, concurring.

I join the opinion of the Court. With respect to its effect on respondent's "right . . . to be secure . . . in [his] perso[n]" guaranteed by the Fourth Amendment, the stop in this case—although it no doubt seriously infringed upon respondent's privacy—lasted a mere matter of moments, see *ante,* at 224–225, before the discovery of the gun ripened what had been merely reasonable suspicion into the full-scale probable cause necessary for an arrest. For circumstances like these, *Terry* v. *Ohio,* 392 U. S. 1 (1968), "defined a special category of Fourth Amendment 'seizures' so substantially less intrusive than arrests that the general rule requiring probable cause to make Fourth Amendment 'seizures' reasonable could be replaced by a balancing test." *Dunaway* v. *New York,* 442 U. S. 200, 210 (1979). See *ante,* at 228. Such a balancing test is appropriate as long as it is conducted with full

regard for the serious privacy interests implicated even by such a relatively nonintrusive stop. See *Terry* v. *Ohio*, *supra*. Of course, in the case of intrusions properly classifiable as full-scale arrests for Fourth Amendment purposes, no such balancing test is needed. Such arrests are governed by the probable-cause standard provided by the text of the Fourth Amendment itself.