THE STATE OF OHIO, APPELLEE, *v.* HOLDEN, APPELLANT.

6

(No. C-840106—Decided
February 27, 1985.)

*Arthur M. Ney, Jr.,* prosecuting attorney, *Christian J. Schaefer* and *Thomas P. Longano,* for appellee.

*Merlyn D. Shiverdecker,* for appellant.

*Per Curiam.* This cause came on to be heard upon an appeal from the Court of Common Pleas of Hamilton County, Ohio.

The appeal is from the judgment entered and sentence imposed pursuant to the verdict of the jury finding the defendant-appellant, Steven Holden, guilty as he stood charged of the aggravated murder of his father, Paul Holden. We note, parenthetically, that three other individuals were also charged jointly in a separate indictment with the same crime, and were tried separately from each other in prosecutions that led to convictions in two of the three cases. This appellant is now serving a sentence of imprisonment for life with a minimum of twenty years.

The first assignment of error is that the court erred, as a matter of law, in failing to suppress certain statements made by the appellant to police subsequent to his arrest. The postulate for this assertion is that the police arrested Holden for investigation of a criminal offense without probable cause, that the arrest was thereby rendered constitutionally infirm, and that such infirmity mandated the suppression of any statement made thereafter.

At about 12:10 a.m., July 25, 1983, an officer assigned to the Criminal Investigation Section of the Cincinnati Police Division received a telephone call which caused him to go to 1625 Westwood Avenue, an address within the city, where, reportedly, a man had been "struck in the face with an ax." When he and a fellow officer arrived at the given address, they learned that the wounded person (subsequently identified as Paul Holden, the victim named in the indictment) had been taken to a local hospital. After viewing the scene and conferring with other police there, the officers left to attempt to interview Paul Holden at the hospital.

At approximately 12:15 a.m., on the same day, police officer Gregory Beck while on routine patrol within the city received a report through his radio that a white male named Steven Holden, 6' 4" in height with a slim build and last seen in the area of the park located at Westwood and Grand Avenues, Cincinnati, in the company of a young woman, was wanted for investigation in connection with an assault.

Some ten minutes later, Officer Beck arrived at the park and observed a man and woman in an area separated from him by a fence. Beck talked to the man and, in response, that individual climbed over the barrier, conversed further with Beck and answered in the affirmative when asked if his name was Steven Holden. Holden was then handcuffed and was transported with his female companion first to 1625 Westwood Avenue and then to the

district station to be held for release to other officers attached to the homicide section. Ultimately, Steven Holden was questioned by such investigators after having been given appropriate advice of his constitutional rights, and made the challenged inculpatory statements to them. Paul Holden died on October 1, 1983, as a result of the head wound he suffered when struck by the ax.

In essence, Steven Holden told his interrogators that his stepbrother, Michael Ballein, and he had entered into a plan to kill Paul Holden because of actions on his part within the household which they felt they could no longer tolerate. Pursuant to that plan, Steven Holden stated, Ballein struck Paul Holden in the head with an ax while Holden was prone in his bed. Steven Holden further admitted that he stood ready to strike his father with a claw hammer in the event Ballein's attack was not successful. Moreover, the respective girlfriends of Ballein and Steven Holden were also involved in the plot before and during the assault. The blow with the ax was sufficiently forceful to imbed it into Paul Holden's skull, but he was able to rise from his bed and to stumble about the house, moaning, for some two hours before the quartet involved in the scheme fled the scene.

Appellant submits that the pivotal question is whether the prosecution proved that Officer Beck's arrest of Steven Holden was supported by probable cause and equates that standard with that specified in R.C. 2935.03 as justification for his argument.

In answering this question, we are guided initially by the decision in State v. Fultz (1968), 13 Ohio St. 2d 79 [42 O.O.2d 259], paragraph two of the syllabus, which states:

"Where a police officer has received information over the police radio and that information is such as to give the officer reasonable grounds to believe a felony has been committed, such officer has probable cause to make an arrest."

The fundament upon which this rule rests is the recognition that a police broadcast is in the nature of an official communication, which is ordinarily regarded as a trustworthy source of information. Id. at 81. Accordingly, the court observed, "* * * upon the receipt of such information it is the duty of the officer to act and act quickly." Id.

In deciding State v. Huneke (Jan. 2, 1985), Hamilton App. No. C-840238, unreported, we applied the rule of Fultz to validate the detention of one who was stopped by a police officer who had received an "all county" radio broadcast concerning an automobile and two occupants involved in an aggravated robbery that had been committed shortly before the transmission.

We believe the question posed by appellant to be answered definitively in United States v. Hensley (1985), 469 U.S. ___, 83 L. Ed. 2d 604.

There, a police officer of the city of St. Bernard, Ohio, who had been told by an informant that Hensley had driven the getaway car from the scene of an armed robbery in that locale, had issued a "wanted flyer" to other area police departments stating that Hensley was wanted for investigation of the robbery. The flyer described Hensley, gave the date and location of the robbery and asked the other departments to pick the suspect up and hold him for the St. Bernard police. Ultimately, police in Kentucky stopped an automobile being driven by Hensley and at that time one of the officers present recognized a passenger in the car as a convicted felon. The officers saw the butt of a handgun protruding from beneath the passenger's seat and a subsequent search of the vehicle uncovered other hand guns. Hensley was arrested and ultimately indicted on a federal charge of being a convicted felon in possession of firearms. The federal district court

denied Hensley's pretrial motion to suppress the handguns from evidence, which had been advanced on the ground that the stop by Kentucky police was in violation of the Fourth Amendment. The court of appeals reversed Hensley's conviction, holding that the stop of Hensley's car was improper because the crime being investigated (the aggravated robbery in Ohio) was not imminent or ongoing, but rather was already completed, and that the "flyer" was insufficient to create a reasonable suspicion that Hensley had committed a crime.

In reversing the court of appeals, the Supreme Court held, at 612, that:

"* * * [W]here police have been unable to locate a person suspected of involvement in a past crime, the ability to briefly stop that person, ask questions, or check identification in the absence of probable cause promotes the strong government interest in solving crimes and bringing offenders to justice. Restraining police action until after probable cause is obtained would not only hinder the investigation, but might also enable the suspect to flee in the interim and to remain at large. * * * The law enforcement interests at stake in these circumstances outweigh the individual's interest to be free of a stop and detention that is no more extensive than permissible in the investigation of imminent or ongoing crimes.

"* * * [When] police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a Terry stop may be made to investigate that suspicion. * * *"

The court at 614-615 went on to state that:

"* * * [I]f a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification, * * * to pose questions to the person, or to detain the person briefly while attempting to obtain further information. * * * It is the objective reading of the flyer or bulletin that determines whether other police officers can defensibly act in reliance on it. * * * Assuming the police make a Terry stop in objective reliance on a flyer or bulletin * * * the evidence uncovered in the course of the stop is admissible if the police who issued the flyer or bulletin possessed a reasonable suspicion justifying a stop * * * and if the stop that in fact occurred was not significantly more intrusive than would have been permitted the issuing department." (Citations omitted.)

The court concluded that since the "flyer," when objectively read and supported by the reasonable suspicion on the part of the St. Bernard police, justified the length and intrusiveness of Hensley's detention, it was irrelevant whether Kentucky police intended to detain Hensley only long enough to confirm the existence of a warrant or for a longer period. *Id.* at 616.

In the case *sub judice,* the prosecution properly assumed the burden to prove the factual basis, *i.e.,* the existence of probable cause, for the radio broadcast upon which Officer Beck made the stop. *United States* v. *Robinson* (C.A. 9, 1976), 536 F.2d 1298; *State* v. *Hill* (1981), 3 Ohio App. 3d 10. Employing the guidelines provided by *United States* v. *Hensley, supra,* and *Illinois* v. *Gates* (1983), 462 U.S. 213, we find that the court did not err in finding under the totality of the circumstances that the state of Ohio had demonstrated probable cause for the detention of Steven Holden, and that the statements thereafter made by him ought not to be suppressed. It is clear to us upon a review of the record that Holden was suspected reasonably of involvement in a felony and was at large, and that Of-

ficer Beck acting in reliance upon the radio message was not required to have personal knowledge of the evidence which prompted his brother officer to send it. Officer Beck's stop of Steven Holden to check his identification was, accordingly, consistent with Fourth Amendment principles. The first assignment of error is without merit and is overruled.

The second assignment of error is that the court erred in overruling appellant's motion to suppress his post-arrest inculpatory statements in the absence of specific findings as to whether they were given voluntarily.

In ruling from the bench upon the motion to suppress evidence, the court stated simply that it was "overruled," and directed the prosecutor to "present an entry accordingly." Counsel for the appellant neither objected to the form adopted by the court nor requested that specific findings be made pursuant to Crim. R. 12(E).

In *State* v. *Wojtowicz* (July 8, 1981), Hamilton App. No. C-800431, unreported, we were confronted by an assignment of error identical to that before us now. We held:

"The eighth assignment of error maintains that the trial court erred in failing to state its essential findings on the record as required by Crim. R. 12(E) when it overruled appellant's motion to dismiss. After the trial court announced the overruling of the motion, defense counsel made no request for findings of fact. In paragraph one of the syllabus of *State* v. *Williams* [(1977), 51 Ohio St. 2d 112 (5 O.O.3d 98)], *supra,* the Ohio Supreme Court held:

" 'An appellate court need not consider an error which a party complaining of the trial court's judgment could have called, but did not call, to the trial court's attention at a time when such error could have been avoided or corrected by the trial court.' "

The assignment of error is accordingly overruled.

Appellant attempts to overcome the obvious handicap presented by this record and the force of *State* v. *Williams* (1977), 51 Ohio St. 2d 112 [5 O.O.3d 98], by urging that the court's "perfunctory ruling is so prejudicial to the defendant as to be clearly erroneous" in light of what he submits was a failure by the prosecution to prove that the statements were made voluntarily.

Without denigrating the significance of *State* v. *Williams, supra,* or agreeing with appellant that the action of the court constituted plain error, we find the assignment not to be well-taken because the court was entitled to find upon the record here that Steven Holden's statements were made voluntarily under the totality of the circumstances. *State* v. *Edwards* (1976), 49 Ohio St. 2d 31 [3 O.O.3d 18], paragraph two of the syllabus.

Because the court had the prerogative to determine the credibility of the witnesses and to assess the weight of the evidence with respect to the circumstances preceding and attending the giving of the statements, it was entitled to conclude, as it did, that Steven Holden was not coerced, harassed or threatened to any degree, and that his statements were voluntary recitations of events. He had been fully advised of his constitutional rights and had indicated his comprehension of them, facts which he does not now dispute. His interrogation was not unduly prolonged, and he was for a considerable period of time in the company of his female friend between the two sessions in which the statements were taken. He was then twenty-five years of age, and other than emphasizing that he was tearful and emotionally distraught, he cannot detail any physical deprivation or mistreatment by his interrogators which should have convinced the court that he was in fear when he detailed the activities in

which he engaged and which culminated in the fatal attack upon his father.

The third assignment of error is that the verdict finding Steven Holden guilty of aggravated murder with prior calculation and design was against the manifest weight of the evidence.

We do not agree.

Paul Holden, without question, died as a result of the severe wound to his skull inflicted by the ax. Steven Holden admitted that he and Michael Ballein had discussed the murder of Paul Holden prior to July 23, 1983. On that night, Paul Holden called his home to request that Steven and Michael come to Kentucky to pick him up from an establishment where he had been drinking. The two young men and their respective female companions went by automobile to the bar, and during the course of the trip discussed the taking of Paul Holden's life. When they returned with Paul Holden, he retired to his bedroom while the others amused themselves by playing cards. In the conversation which accompanied the card game, the final plan was formulated. Michael Ballein obtained the ax, Steven Holden obtained a claw hammer, one of the women went into the bedroom to determine whether Paul Holden was asleep, and Ballein then drove the ax into his stepfather's head as Steven Holden stood in the doorway of the bedroom ready to assist if Ballein's blow was not effective, all of which proceeded according to the plan.

It is axiomatic today that where, from the evidence, reasonable minds can reach different conclusions on the issue whether the defendant is guilty beyond a reasonable doubt, the case is one for the jury. *State* v. *Antill* (1964), 176 Ohio St. 61 [26 O.O.2d 366], paragraph five of the syllabus. The corollary to this general rule is that a reviewing court will not reverse a jury verdict where there is substantial evidence upon which a jury could conclude reasonably that all the elements of an offense have been proven beyond a reasonable doubt. *State* v. *Eley* (1978), 56 Ohio St. 2d 169 [10 O.O.3d 340], syllabus.

In the case *sub judice* we are convinced by the record that the prosecution adduced substantial evidence to prove every essential element of the crime charged in the indictment pursuant to R.C. 2903.01(A), and that the jury was thereupon entitled to give the weight and credit necessary to find Steven Holden guilty either as a principal or as an aider and abettor according to R.C. 2923.03(F). The third assignment of error is, therefore, overruled.

The judgment of the Court of Common Pleas of Hamilton County is affirmed.

*Judgment affirmed.*

SHANNON, P.J., BLACK and KLUSMEIER, JJ., concur.