FILED
**United States Court of Appeals**
**Tenth Circuit**

**June 16, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

### UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JONAS DALVEYON TYLER,

    Defendant - Appellant.

No. 24-6035

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:23-CR-00092-PRW-1)**

_____

Leah D. Yaffe, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender with her on the briefs), Denver, Colorado, for Defendant-Appellant.

Tanner Hermann, Assistant U.S. Attorney (Robert J. Troester, United States Attorney and Daniel D. Gridley, Jr., Assistant United States Attorney with him on the brief), Oklahoma City, Oklahoma, for Plaintiff-Appellee.

_____

Before **HOLMES**, Chief Judge, **SEYMOUR**, and **BACHARACH**, Circuit Judges.

_____

**SEYMOUR**, Circuit Judge.

_____

Defendant Jonas Tyler appeals from his conviction and sentence stemming from the December 21, 2022 search of his car by the Oklahoma City Police Department. Mr. Tyler moved to suppress the evidence from the search, but when the

district court ruled against him he entered a conditional guilty plea to one count of possession of a firearm by a previously convicted felon. In his plea, he reserved his right to appeal on the suppression issue. The district court sentenced him to 84 months incarceration. On appeal, Mr. Tyler argues that the government violated his Fourth Amendment rights by detaining him for longer than was reasonable.

For the reasons explicated *infra*, we agree with Mr. Tyler. Accordingly, exercising jurisdiction under 28 U.S.C. § 1291, we **vacate** Mr. Tyler's conviction and sentence and **remand** for further proceedings consistent with this opinion.

**I**

On December 21, 2022 at 8 pm, a local police officer, Sergeant Travis Teague, received a tip that Karen Gonzalez, who had an outstanding arrest warrant for failure to appear in a drug trafficking case, was at a Days Inn near I-40 in Oklahoma City. Sergeant Teague asked for help from two undercover officers, Lieutenant Mack Merits and Officer Tyler Harman. The three began surveilling the Days Inn parking lot for Ms. Gonzalez. Officer Harman saw someone he believed to be Ms. Gonzalez get into the passenger side of a gold Chevy, and the three officers followed the car across the street to a gas station. The front passenger got out of the car to go into the gas station store, and Officer Harman was able to confirm that it was Ms. Gonzalez.

Ms. Gonzalez left the gas station store and returned to the front passenger seat of the car. Mr. Tyler was either standing next to or partially inside the car on the driver's side. Officers approached the car with their guns drawn and yelled at Mr. Tyler and the two female passengers not to move and to show their hands. Mr. Tyler

2

complied with instructions to walk towards Sergeant Teague with his hands up, and he was then handcuffed and extensively patted down before being put in the back of a police car. Sergeant Teague also took Mr. Tyler's cell phone and put it in the Chevy, where Mr. Tyler could not access it.

As Mr. Tyler was being detained and searched, Officer Harman removed a woman from the back seat of the gold Chevy, handcuffed her, and told her to sit on a curb, where Lieutenant Merits kept watch over her. Next Officer Harman pulled Ms. Gonzalez out of the front passenger seat, handcuffed her, and brought her over to the same curb, where she sat calmly for the rest of her time at the gas station.

While this was going on, Sergeant Teague called for a female officer to come to the scene so she could conduct a pat down of Ms. Gonzalez. He then started talking to Mr. Tyler. Sergeant Teague asked Mr. Tyler if the car belonged to him and Mr. Tyler said it did. Sergeant Teague asked Mr. Tyler whether there was anything of interest in the car. Mr. Tyler said no and asked what was going on. Sergeant Teague told him that Ms. Gonzalez had a warrant out for her arrest. Mr. Tyler looked surprised, and Sergeant Teague told him to watch the company he kept.

Sergeant Teague then asked if he could search Mr. Tyler's car. Mr. Tyler said no, noting that he had nothing to do with whatever Ms. Gonzalez had done. At that point, Sergeant Teague shut the back door of his patrol car, leaving Mr. Tyler handcuffed in the back seat, and went to talk with the other officers. He told them Mr. Tyler objected to a search but noted that a K-9 unit was in the area. He decided

3

to call for the K-9 and handler to come to the scene so the dog could sniff Mr. Tyler's car.

Nearly fifteen minutes after Mr. Tyler's detention began, and at least ten minutes after the officers had finished arresting Ms. Gonzalez, Officer Keegan Burris and his K-9 dog arrived and began to conduct an open-air dog sniff. The dog alerted to Mr. Tyler's car, and the officers proceeded to search it. They found a firearm and about six grams of suspected fentanyl pills. Sometime after Officer Burris and his K-9 dog arrived, a female officer came to pat down the two women.

After being charged with possession of a firearm by a previously convicted felon, Mr. Tyler moved to suppress the evidence found in his car as well as any statements he made. He claimed that his continued detention at the gas station past the point when officers had handcuffed and arrested Ms. Gonzalez was unconstitutional. Mr. Tyler conceded that his initial detention was reasonable as part of the process of arresting Ms. Gonzalez, but he argued that his continued detention after Ms. Gonzalez had been handcuffed and arrested was unreasonable and a violation of his Fourth Amendment rights. The government argued that Mr. Tyler's continued detention while officers waited for a female officer to arrive on the scene to pat down Ms. Gonzalez was reasonable to protect officer safety, although they acknowledged there was no reason to believe Mr. Tyler was dangerous or otherwise suspicious. The district court ruled in favor of the government, after which Mr. Tyler entered a conditional plea to the single-count indictment, expressly reserving his

right to appeal the district court's suppression ruling. He was sentenced to 84 months in prison, followed by three years of supervised release. This timely appeal followed.

**II**

We review "the ultimate determination of reasonableness de novo" when hearing an appeal of a suppression ruling. *United States v. Koerber*, 10 F.4th 1083, 1103 (10th Cir. 2021). Mr. Tyler and the government agree that his initial detention was reasonable to allow the police to arrest Ms. Gonzalez. The disagreement is about Mr. Tyler's continued detention after officers had handcuffed and arrested Ms. Gonzalez and were only waiting for the arrival of a female officer to pat her down before she could be transported away from the scene.

In cases of warrantless detentions without probable cause, reasonableness is determined through a balancing test between the "nature and quality of the intrusion" on a detained person's liberty and personal security rights against the "governmental interests alleged to justify the intrusion." *United States v. Hensley*, 469 U.S. 221, 228 (1985). This balancing test applies not only to the initial detention, but to its scope and duration. "When the nature and extent of the detention are minimally intrusive of the individual's Fourth Amendment interests, the opposing law enforcement interests can support a seizure based on less than probable cause." *United States v. Place*, 462 U.S. 696, 703 (1983). In other words, a detention that is reasonable at the outset can become unreasonable if extended for an unwarranted amount of time.

The government points to *United States v. Dennison*, 410 F.3d 1203 (10th Cir. 2005), to support its position but this is off the mark. In *Dennison*, officers conducted

a search of a car at 3 am after establishing reasonable suspicion that both occupants of the car were engaged in criminal activity. *Id.* at 1206. We upheld that search because "officers had a reasonable suspicion that Mr. Dennison was dangerous and able to gain immediate control of weapons." *Id.* at 1214. Critical to that conclusion was the fact that Mr. Dennison was parked in a lot "that had a high incidence of nighttime car theft," and also was in a truck "officers . . . had reason to believe that weapons may be found in." *Id.* at 1205, 1212. Mr. Dennison's detention and resulting search of his car were justified by officers' reasonable suspicion of wrongdoing and dangerousness. Put another way, Mr. Dennison would have been held and searched even if his companion was not being arrested. Mr. Tyler's case is distinguishable because unlike in *Dennison*, the police had no reasonable suspicion of wrongdoing or dangerousness on Mr. Tyler's part. Rather, the government's interests in detaining Mr. Tyler were: (1) arresting Ms. Gonzalez and (2) doing so safely.

The government argues that its arrest of Ms. Gonzalez, which seems to have taken approximately one minute, was not completed until they could conduct a pat down and then transport her away from the gas station. They further point to a department policy that requires pat downs of female detainees be conducted by female officers. They argue that the extended time Mr. Tyler was detained simply reflected the length of time necessary for a female officer to arrive at the scene to conduct the pat down. However, we are not convinced that an arrest is incomplete when, after removing the subject of the arrest warrant from a car at gun point, the officers have successfully handcuffed her and confined her to an area of their

6

choosing. Mr. Tyler should not have been expected to sit, handcuffed, in the back of a police car for a quarter of an hour after the police had effectively accomplished Ms. Gonzalez's arrest.

The government also argues that Mr. Tyler had to be detained to keep officers safe. To be sure, officer safety is an important government interest. At the same time, it is not absolute, and the mere speculative possibility of danger cannot justify all conceivable governmental intrusions on the liberty interests protected by the Fourth Amendment. In this case, the government provided no specific or particularized evidence that Mr. Tyler posed any danger to the officers. Indeed, despite the government's arguments to the contrary, it is not clear that Ms. Gonzalez herself posed any meaningful danger to police. Unlike in *Dennison*, where the passenger had just admitted that he had recently been involved in a "domestic" situation and "had four outstanding arrest warrants, including a felony arrest warrant for a weapons violation," Ms. Gonzalez was simply wanted for failure to appear in a drug trafficking case. *Id.* at 1206.

Despite having done nothing to bring any of this on himself, Mr. Tyler experienced a severe intrusion on his liberty interests. After running Mr. Tyler's name and information, Sergeant Teague knew there were no outstanding arrest warrants for Mr. Tyler but kept him detained anyway. At any point, Sergeant Teague could have accomplished the goal of separating Mr. Tyler from Ms. Gonzalez by telling Mr. Tyler to leave the gas station. Instead, Mr. Tyler was kept handcuffed in the back of a police car. The government attempts to justify this infringement on Mr.

Tyler's rights through pure speculation about what Mr. Tyler might have done in the worst-case scenario, despite the police having no reason to suspect or fear him. Allowing such a weak justification to support such a serious trampling on individual rights would practically nullify the Fourth Amendment as applied to people who happen to be in the vicinity of someone being arrested. Mr. Tyler should have been allowed to leave the scene after Ms. Gonzalez was handcuffed and detained. Accordingly, the evidence discovered against him from that point on should have been suppressed.

### III

For the foregoing reasons, we **VACATE** Mr. Tyler's conviction and sentence and **REMAND** the case for further proceedings consistent with this opinion.