# IN THE COURT OF APPEALS OF IOWA

No. 24-0867
Filed June 18, 2025

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**CADE FRANCIS SINCLAIR,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Warren County, Kevin Parker, Judge.

Cade Francis Sinclair challenges the denial of his motion to suppress evidence obtained during an investigatory stop of his vehicle. **AFFIRMED.**

Sydney N. Ross (argued), of Ross Law, PLC, Des Moines, for appellant.

Brenna Bird, Attorney General, and Joseph D. Ferrentino (argued), Assistant Attorney General, for appellee.

Heard at oral argument by Greer, P.J., and Badding and Chicchelly, JJ.

**CHICCHELLY, Judge.**

On appeal from his conviction for operating while intoxicated (OWI), first offense, Cade Francis Sinclair challenges the denial of his motion to suppress evidence obtained during an investigatory stop of his vehicle. The sole question is whether the officer had reasonable suspicion of criminal activity to justify the investigatory stop of Sinclair's vehicle. Because the evidence supports a finding that there was reasonable suspicion for the stop, we affirm the denial of Sinclair's motion to suppress and affirm his conviction.

**I. Background Facts and Proceedings.**

Shortly after 2:00 a.m. on November 23, 2023, a Norwalk resident called 911 to report a disturbance at her home. The caller explained that her smart doorbell showed two "young kids" at the front door looking for somebody who did not live there. They then proceeded to the backyard instead of leaving, so the caller asked the 911 operator to send an officer to address the situation. She described the two individuals as white males and estimated that they were "at least teenagers" or in their early twenties. She also said that they "seemed to be intoxicated" because they were "cussing and loud," "banging into everything," and "running into my windchimes and everything else outside." Another resident of the home can be heard agreeing: "They're definitely intoxicated."

After about two minutes on the phone with the 911 operator, the caller reported that the two strangers "got in a truck and left." The other resident described their vehicle as "a silver or white four-door pickup, pretty new from what I can tell," and stated that it was headed north. As the truck drove away, the caller

checked the video recording and saw there were "about four" people in the truck and that "someone else is driving."

Officer Gregg Hepperly responded to a dispatch about the call. As he proceeded toward the residence, he encountered a silver four-door pickup truck with four white males inside. Because of the early hour, it was the first vehicle the officer encountered while driving the one and one-half miles from the police station to the area. Believing the vehicle was likely the same one described in the 911 call, Officer Hepperly turned and followed the truck a short distance before initiating a traffic stop. The officer did not note any erratic driving before the officer turned his lights on to initiate the stop, and the truck immediately pulled over and parked.

Officer Hepperly approached the vehicle and informed the occupants that he stopped them based on the 911 call. One of them denied that they were the people who had gone to the residence. But the driver, later identified as Sinclair, admitted they had gone to the wrong house.

While speaking to Sinclair, Officer Hepperly "could smell a strong odor of alcohol emitting from his person." He also noted that Sinclair had "bloodshot/watery eyes and spoke with slurred/mumbled speech." Based on his observations, the officer suspected that Sinclair was intoxicated and asked him to exit the vehicle for field sobriety testing. When Sinclair failed the field sobriety tests, Officer Hepperly took him into custody and transported him to the police station. Breath testing showed Sinclair's blood alcohol concentration was .129%.[1]

---

[1] Iowa Code section 321J.2(1)(b) (2023) defines the offense of OWI as operating a motor vehicle "[w]hile having an alcohol concentration of .08 or more."

The State charged Sinclair with OWI, first offense. Sinclair pled not guilty and moved to suppress the evidence from the traffic stop, claiming the stop violated his constitutional right to be free from unreasonable search and seizure. The district court denied the motion, finding the officer had reasonable suspicion of criminal activity as required for an investigatory stop based on the detailed report about the actions and condition of two individuals, a description of the vehicle they left in, and the direction of the vehicle's travel. Sinclair moved to enter a conditional guilty plea.[2] *See* Iowa R. Crim. P. 2.8(2)(b)(9) ("With the consent of the court and the prosecuting attorney, a defendant may enter a conditional plea of guilty, reserving in writing the right to have an appellate court review an adverse determination of a specified pretrial motion."). The court granted Sinclair's motion and entered an order of disposition. Sinclair appeals.

**II. Scope and Standard of Review.**

We review the denial of a motion to suppress based on an alleged deprivation of a constitutional right de novo. *State v. Salcedo*, 935 N.W.2d 572, 577 (Iowa 2019). On de novo review, we examine and independently evaluate the entire record. *Id.* Based on the district court's ability to evaluate witness credibility, we give deference to its factual findings but are not bound by them. *Id.*

**III. Discussion.**

Sinclair contends the traffic stop of his vehicle violated federal and state constitutional protections against warrantless government seizures because there

---

[2] There is no dispute that consent was given. We find appellate review of the reserved issue is in the interest of justice. See Iowa Code § 814.6(3) (2023); *State v. McClain*, ___ N.W.3d ___, ___, 2025 WL 1271142, at *5 (Iowa 2025).

was no reasonable suspicion that criminal activity was afoot. The reasonable suspicion exception to the warrant requirement allows law enforcement to briefly detain a person for investigatory purposes when there is reasonable suspicion to believe that criminal activity has occurred or is occurring. *State v. Sallis*, 981 N.W.2d 336, 344 (Iowa 2022). The purpose of such a stop is to allow officers to confirm or dispel their suspicions through reasonable questioning. *Id.* Because an investigatory stop involves only brief detention, it requires "considerably less than proof of wrongdoing by a preponderance of the evidence." *Id.* (citation omitted). It requires "specific and articulable facts, which taken together with rational inferences from those facts, to reasonably believe criminal activity may have occurred." *State v. Tague*, 676 N.W.2d 197, 204 (Iowa 2004).

The court determines whether reasonable suspicion supported an investigatory stop by looking at "the totality of the circumstances confronting the officer, including all information available to the officer at the time the officer makes the decision to stop the vehicle." *Id.* Although the actual motivations of the officer do not control, the stop must be justified by more than a mere suspicion or hunch. *Id.* "A good test of such a founded suspicion is that 'the possibility of criminal conduct was strong enough that, upon an objective appraisal of the situation, we would be critical of the officers had they let the event pass without investigation.'" *State v. Kreps*, 650 N.W.2d 636, 642 (Iowa 2002) (citation omitted).

Sinclair first contends that Officer Hepperly did not have a reasonable suspicion that criminal activity was afoot, suggesting courts have found stops unconstitutional even when "based on more developed facts." He cites *State v. Haviland*, 532 N.W.2d 767, 768 (Iowa 1995) (per curiam), in which an officer

patrolling a gravel road at 12:30 a.m. noticed a vehicle's headlights turn on near the driveway of a limestone mining and processing plant. The driveway had a locked gate and "keep out" sign. 523 N.W.2d at 768. The area that had been the subject of complaints about burglaries, juvenile alcohol possession, and marijuana use, though no complaints had been made that week. *Id.* As the vehicles approached each other, the officer began a traffic stop. *Id.* During the stop, the officer saw what appeared to be marijuana on the floor of the vehicle and arrested the occupants. *Id.* The supreme court held that a vehicle being parked in a closed business area and turning on its lights and leaving as a police vehicle approached did not, by itself, create more than "an inchoate and unparticularized suspicion" of criminal activity. *Id.*

*Haviland* is easily distinguishable, as the officer who stopped the vehicle "was not investigating a crime," "had no information respecting the car or its occupants," and "had not been informed of any recent suspicious activities in that area." *Id.* at 769. In contrast, Officer Hepperly responded to a resident's request for police assistance with two individuals who appeared to be intoxicated and were disrupting their peace at 2:00 a.m. They did not seem to understand that the person they were looking for did not live at the address because even after speaking to the resident, they proceeded to the backyard where they continued

the disruption.[3]  Although they eventually left, the resident was concerned about the possibility of their return, stating, "I don't want them to come back here." Although Officer Hepperly did not observe Sinclair driving erratically, the information he received from the dispatch about the truck's appearance, location, and occupants provided a reasonable basis for stopping his vehicle for a brief investigation.

Sinclair acknowledges that we recently addressed a similar issue in *State v. Sinclair*, No. 23-0331, 2024 WL 260828, at *2–3 (Iowa Ct. App. Jan. 24, 2024), which involved a stop of a black SUV after two 911 callers expressed concern about a woman "freaking out" as the SUV repeatedly drove past her and its occupant yelled or attempted to speak to her.  In *Sinclair*, we found reasonable suspicion to initiate an investigatory stop of the SUV to determine the driver's involvement in the disturbance.  2024 WL 260828, at *3.  Sinclair tries to distinguish that case by noting that the woman's "cries of 'please help me, don't hurt me' could lead an officer to infer that an assault [was] taking place." *Id.*  He argues that, here, the call to 911 about two individuals who appeared intoxicated is "significantly different" because they "left the area without incident after being informed they

---

[3] The caller told the 911 operator:
> We had some young kids at our door.  They seem to be intoxicated. And I got on my Ring doorbell, and they're looking for someone who doesn't live here, *and they still think they are*.  And now I can hear them in my . . . backyard.  I don't know what they're doing, but I don't want to go out there.  I don't know if you can send an officer over . . . . They're loud.  I have to work in the morning and they're [sighs].  I can hear them in my backyard now, and they're just banging into everything and [sighs].

(Emphasis added.)  She reiterated, "[T]hey're cussing and loud, and they think some guy lives here."

were at the wrong house." But as we noted above, the individuals seemingly failed to appreciate that they were at the wrong address and proceeded to cause a disturbance in the backyard before leaving. Although the caller did not say, "Please help me," her stated concern about the individuals returning and query about sending an officer over indicated a continuing situation, justifying an investigatory stop.

Sinclair also claims that even if Officer Hepperly had reasonable suspicion that occupants of his vehicle committed the crime of public intoxication, "a completed, non-violent interaction with no immediate threat to public safety" cannot justify an investigatory stop. He cites *United States v. Hensley*, 469 U.S. 221, 228–29 (1985),[4] in which the Supreme Court considered the limits on initiating an investigatory stop to investigate past criminal activity. The Court held that the same test used in investigating imminent or ongoing crimes, which "balances the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion," would apply. *Hensley*, 469 U.S. at 228. But the Court recognized that the governmental interests and the nature of the intrusions involved may differ for investigations of ongoing crimes versus completed offenses. *Id.*

> A stop to investigate an already completed crime does not necessarily promote the interest of crime prevention as directly as a stop to investigate suspected ongoing criminal activity. Similarly, the exigent circumstances which require a police officer to step in before a crime is committed or completed are not necessarily as pressing long afterwards. Public safety may be less threatened by a suspect

---

[4] Unlike the stop of Sinclair's vehicle, which occurred within minutes of Officer Hepperly's dispatch, the armed robbery in *Hensley* occurred almost two weeks before the officer stopped a vehicle after recognizing a passenger from a "wanted flyer" circulated at the police station. 469 U.S. at 223–24.

in a past crime who now appears to be going about his lawful business than it is by a suspect who is currently in the process of violating the law. Finally, officers making a stop to investigate past crimes may have a wider range of opportunity to choose the time and circumstances of the stop.

*Id.* at 228–29. Ultimately, the Supreme Court rejected the view that probable cause is needed to stop a person suspected of a past felony. *Id.* at 229 ("[I]f police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a[n investigatory] stop may be made to investigate that suspicion."). But the Court did not address whether reasonable suspicion of a completed misdemeanor or lesser offense is enough to justify an investigatory stop. *Id.* (declining to decide whether "stops to investigate all past crimes, however serious, are permitted").

Following *Hensley*, the Eighth Circuit refused to adopt a per se rule about investigatory stops of completed misdemeanors. *United States v. Hughes*, 517 F.3d 1013, 1017 (8th Cir. 2008). It held that "the nature of the misdemeanor and potential threats to citizens' safety are important factors" to consider when applying the test followed in *Hensley*. *Id.* *Hughes* involved the dispatch of a police officer to an apartment complex to investigate an anonymous complaint about "suspicious parties on the property." *Id.* at 1015. Because the defendant and a companion met the description given by dispatch, the officer questioned and frisked them. *Id.* Viewing the anonymous complaint as one about a previous trespass, the Eighth Circuit held that the government's interest in investigating it did not outweigh the defendant's personal interest in being free of arbitrary interference by the police. *Id.* at 1018. The court noted there was no strong threat to public safety because

Hughes was "not acting suspiciously, and there was no report of any property crime, personal crime, or any weapons. The officer agreed that there was 'nothing in Dispatch . . . to imply that this may be a dangerous situation.'"[5]  *Id.* (alteration in original).

Sinclair compares the dispatch of Officer Hepperly following the 911 call to the dispatch of the officer in *Hughes*, claiming Officer Hepperly had no reason to believe that the passengers of his truck posed any threat of danger.  He emphasizes that during the 911 call, the residents stated they did not see the two individuals in possession of any weapons or illicit substances or report any crimes to people or property.  He also claims that the offense of public intoxication, which was completed when the individuals left the scene, is a minor offense that does not carry a strong governmental interest in immediate apprehension sufficient to justify the stop.

Sinclair's characterization of the phone call omits facts that factor heavily in assessing whether Officer Hepperly had a reasonable suspicion that justified an investigatory stop.  As discussed above, the interlopers did not leave when the home's resident informed them that the person they were looking for did not live there.  Instead, they proceeded into the backyard where they continued searching for the individual.  The resident could no longer see the individuals at that point, but she told the 911 operator that she could hear them loudly cussing, stumbling about, and bumping into "everything."  The context of the recorded call makes it

---

[5] Although the facts of *Hughes* did not justify an investigatory stop, the Eighth Circuit noted that at times such a stop "*is* justified to investigate completed trespass, such as where there is a strong threat to public safety." *Hughes*, 517 F.3d at 1018 (emphasis added).

clear that the resident was concerned about safety as she tells the operator that she does not want to "go out there" to see what they were doing, instead asking for an officer to investigate.

The facts are closer to those described in *Bates ex rel. Johns v. Chesterfield County, Virginia*, in which the Fourth Circuit found an officer's suspicion that criminal activity may be afoot "was more than reasonable." 216 F.3d 367, 371 (4th Cir. 2000). In that case, a 911 dispatcher informed the officer that a "suspicious subject" walked up to a caller's "garage and seemed not to comprehend where he was at" before running into the woods at the end of the cul-de-sac. *Id.* The officer was also informed that the individual may have been intoxicated. *Id.* (noting that a witness told the officer something like, "I don't know if this boy is on drugs or drunk but he is acting weird or crazy and just went running through the woods"). The Fourth Circuit concluded that based on these facts, it was reasonable for the officer to stop the individual and assess the situation. *Id.*

We find there is sufficient evidence showing the officer had a reasonable suspicion of criminal activity to justify stopping Sinclair's vehicle for further investigation. Because the district court properly denied Sinclair's motion to suppress the evidence discovered following the stop, we affirm.

**AFFIRMED.**