Tina D. ROBERSON *v.* STATE of Arkansas

CA CR 95-714 925 S.W.2d 820

Court of Appeals of Arkansas
En Banc
Opinion delivered June 26, 1996

*Daniel D. Becker,* for appellant.

*Winston Bryant,* Att'y Gen., by: *J. Brent Standridge,* Asst. Att'y Gen., for appellee.

JUDITH ROGERS, Judge. Appellant, Tina Roberson, was convicted by a jury of possession of a controlled substance with intent to deliver and sentenced to twenty-three years in the Arkansas Department of Correction. Prior to trial, appellant filed a motion to suppress the fruits of an alleged illegal search and her subsequent statement. The trial court denied the motion, and it is from that denial that appellant appeals. We affirm.

The record reveals that a Hot Springs officer received a radio broadcast advising the officer to be on the look out for a yellow

Datsun pick-up truck with a certain license plate number, occupied by a white male and black female.[1] The officer was informed that the occupants were suspected of selling stolen jewelry. Lieutenant Bond observed the suspect vehicle and made an investigatory stop. Lieutenant Bond observed a ring box on the front seat of the vehicle. He was questioning the occupants when a back-up officer arrived. The back-up officer conducted a weapons search of appellant and located controlled substances and drug paraphernalia. Appellant was arrested and gave a statement to local Drug Task Force agents.

On appeal, appellant argues that Lieutenant Bond lacked sufficient probable cause or reasonable suspicion to make an investigatory stop of the vehicle in which she was a passenger. Appellant specifically contends that Lieutenant Bond could not have had more than a bare suspicion that the occupants of the vehicle were involved in any criminal activity, either a felony or a misdemeanor.

■ Rule 3.1 of the Arkansas Rules of Criminal Procedure permits a police officer to stop and detain any person that he reasonably suspects has committed or is about to commit a felony or a misdemeanor involving danger of forcible injury to persons or property, where it is reasonably necessary to obtain or verify the identification of the party or to determine the lawfulness of his conduct. "Reasonable suspicion" means that suspicion based on facts and circumstances which, in and of themselves, may not constitute probable cause to justify a warrantless arrest, but which give rise to a suspicion that is reasonable as opposed to imaginary or conjectural. Ark. R. Crim. P. 2.1; *Folly v. State*, 28 Ark. App. 98, 771 S.W.2d 306 (1989). The justification for an investigatory stop depends on whether under the totality of the circumstances the police have a particularized, specific, and articulable reason indicating that the person or vehicle may be involved in criminal activity. *Nottingham v. State*, 29 Ark. App. 95, 778 S.W.2d 629 (1989).

---

[1] This was simply the description broadcast over the radio, and there is no indication that it was intended to convey a malevolent purpose. Nevertheless, the dissent suggests that the report and the actions of the police were racially motivated. While we respect the dissenting judge's sensitivity to such issues, there is nothing in the record to support that conclusion, nor does appellant herself suggest that the color of her skin, or the fact that she was in the company of a white male, played any role in the chain of events culminating in her arrest.

In the *Nottingham* case, an officer received a phone call from the owner of a local Travel Mart alerting him of a possible DWI suspect in a red Ford pickup. The officer proceeded to the area and approached the suspect's vehicle and found him asleep in the truck with a beer can. We found that the information provided by the owner acted as a catalyst for the officer to investigate which the officer had a duty to perform. Thus, we concluded that the officer's actions were justified based upon reasonable suspicion pursuant to Ark. R. Crim. P. 3.1. Also, in the case of *Leopold* v. *State*, 15 Ark. App. 292, 692 S.W.2d 780 (1985), we found that an officer had a reasonable suspicion to make an investigatory stop when he spotted appellants' truck at 2:00 a.m. traveling at ten miles an hour down a gravel road owned by International Paper but open to the public. The officer suspected that appellants could possibly have been head-lighting or spotlighting for deer.

The facts presented to the trial court in this case, with all presumptions favorable to the trial court's ruling, *Johnson* v. *State*, 319 Ark. 78, 889 S.W.2d 764 (1994), are these: the owner of Monty's Pawn Shop reported that a white male and black female had tried to pawn some jewelry which appeared to be stolen. A radio dispatch was sent to officers alerting them to "be on the look out for" a yellow Datsun pickup occupied by a white male and black female who had been attempting to sell possibly stolen jewelry. The dispatch described the vehicle, the occupants, and provided the license number of the vehicle.

Lieutenant Bond testified that he received the radio dispatch and subsequently spotted the vehicle matching the description. He testified that he stopped the vehicle because it was his understanding that "they had been down to Monty's Pawn Shop and tried to sell some jewelry that appeared to have been stolen." When asked what gave rise to his suspicion that the individuals were doing something wrong, Lieutenant Bond responded "[w]ell, after thirteen years with the Detective Bureau, we'd dealt with pawn shops quite a bit. They, any time they have someone who comes in there with an obviously expensive piece of jewelry who don't, obviously don't appear to be people who would have this type of jewelry normally, or a large quantity of jewelry and so forth creates, anything of a suspicious nature, they usually give us a call or some of them do." Lieutenant Bond indicated that the pawn shops in the area had provided information in the past of illegal activity being

attempted in their stores. Lieutenant Bond testified that after stopping the truck, he approached the vehicle and noticed a ring box on the front seat. Lieutenant Bond said that he then questioned the occupants of the vehicle.

 Appellant argues that the person reporting to the police did not see a crime committed or have knowledge that a crime was being committed. Also, appellant asserts that there was no independent corroboration of the radio dispatch that the occupants of the vehicle were involved in any criminal activity. In arguing that the stop was unreasonable, appellant places great emphasis on the proposition that no one knew that a crime had been committed. However, the Supreme Court noted in *U.S.* v. *Hensley*, 469 U.S. 221 (1985), that "although the officer who issues a wanted bulletin must have a reasonable suspicion sufficient to justify a stop, the officer who acts in reliance on the bulletin is not required to have personal knowledge of the evidence creating a reasonable suspicion." *Id.* at 231. Quoting from the Ninth Circuit, the Supreme Court further expressed "that effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information." *Id.* at 231. Also, in the cases of *Terry* v. *Ohio*, 392 U.S. 1 (1968); *Nottingham, supra*; and *Leopold* v. *State*, 15 Ark. App. 292, 692 S.W.2d 780 (1985), no one knew that a crime had been committed. Therefore, it is clear that it has never been a requirement that someone *know* that a crime had been committed before an officer can conduct an investigatory stop. As the Supreme Court noted in *Adams* v. *Williams*, 407 U.S. 143 (1972):

> The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be more reasonable in light of the facts known to the officer at the time.

As noted in *Terry* v. *Ohio*, 392 U.S. 1 (1968), one general interest present in the context of ongoing or imminent criminal activity is "that of effective crime prevention and detection." In this case, it would have been impossible for the police to determine if the jewelry was stolen before appellant was stopped because the jewelry was in the possession of the suspected individuals. "Restraining police action until after probable cause is obtained would not only hinder the investigation, but might also enable the suspect to flee in the interim and to remain at large. Particularly in the context of felonies or crimes involving a threat to public safety, it is in the public interest that the crime be solved and the suspect detained as promptly as possible." *U.S.* v. *Hensley*, 469 U.S. 221, 229 (1985).

■ Here, Lieutenant Bond not only had the information from the dispatch but he also had personal knowledge that the local pawn shops had given reliable information in the past that was used by the police, and he confirmed the vehicle description, license number and identification of the occupants of the truck. Lieutenant Bond also observed a ring box on the front seat of the individuals' vehicle before questioning the suspects. Based on the totality of the circumstances in this case, we cannot say that the trial court's denial of appellant's motion to suppress was clearly against the preponderance of the evidence. *See Bliss* v. *State*, 33 Ark. App. 121, 802 S.W.2d 479 (1991).

Affirmed.[2]

COOPER, STROUD, and MAYFIELD, JJ., agree.

JENNINGS, C.J., and GRIFFEN, J., dissent.

---

[2] The dissent is simply wrong in suggesting that a case such as this should be dismissed upon reversal. The double jeopardy clause does not forbid retrial so long as the sum of the evidence offered by the State and admitted by the trial court — whether erroneously or not — would have been sufficient to sustain a guilty verdict. *Nard* v. *State*, 304 Ark. 159, 163-A, 801 S.W.2d 634, 637 (1990) (supplemental opinion denying rehearing). *See also Crutchfield* v. *State*, 306 Ark. 97, 104, 816 S.W.2d 884 (1991) (supplemental opinion granting rehearing). Considering all of the evidence in this case, there is substantial evidence to support the verdict. Consequently, if this court were to reverse based on appellant's claim of trial error, it would be appropriate for this court to remand, leaving it to the prosecution to decide whether or not the appellant is to be retried.

WENDELL L. GRIFFEN, Judge, dissenting.

*It is a capital mistake to theorise before one has data.*
*Insensibly one begins to twist facts to suit theories,*
*instead of theories to suit facts.*
—Sherlock Holmes to Dr. Watson,<br>from <em>A Scandal in Bohemia</em>,<br>by Sir Arthur Conan Doyle

*There is nothing more frightful than an active ignorance.*

—Johann Wolfgang von Goethe

Despite the plain requirement that the police have a reasonable suspicion that a person is committing, has committed, or is about to commit a crime before making an investigatory stop, and the equally clear principle that an investigatory stop is a seizure within the Fourth Amendment's protection against unreasonable seizures, today we uphold a stop based upon an unconfirmed report from an unidentified informant that a black woman and a white man were riding a yellow Toyota truck and trying to sell "possibly stolen" jewelry at an unidentified pawn shop. Because the record contains no proof justifying a suspicion that appellant or anyone else had committed, was committing, or was about to commit a crime, I respectfully disagree with the result reached in this case and write to challenge the reasoning beneath it.

Appellant made a timely and proper motion to suppress the evidence obtained when she was searched after the stop as well as her statement to the police. She contended that there was neither probable cause nor reasonable suspicion for stopping the vehicle in which she was riding and detaining her. Her motion was based upon Rules 2.1 and 3.1 of the Arkansas Rules of Criminal Procedure and a clear line of cases that holds that there must be specific, particularized, and articulable reasons indicating that the person or vehicle stopped may be involved in criminal activity in order to justify an investigative stop. *Van Patten v. State*, 16 Ark. App. 83, 697 S.W.2d 919 (1985). *Hill v. State*, 275 Ark. 71, 628 S.W.2d 284 (1982); *Hayes v. State*, 269 Ark. 47, 598 S.W.2d 91 (1980). Her motion should have been granted. Her conviction for possession of a controlled substance with intent to deliver should be reversed. The charge against her should be dismissed.

On July 21, 1994, Lieutenant Travis Bond of the Hot Springs

Police Department was on patrol duty in a marked police car when a radio broadcast was issued directing officers to be on the lookout for a yellow Toyota pickup truck occupied by a white male and black female who had been attempting to sell some "possibly stolen jewelry." Although Lieutenant Bond testified at the suppression hearing that he understood that a white male and a black female had been to Monty's Pawn Shop in Hot Springs and that they had tried to sell jewelry that appeared to have been stolen, he admitted that the radio dispatch did not indicate that the source of the tip was Monty's Pawn Shop. The record does not contain the identity of the source of the information that was in the radio dispatch. No testimony was presented from the dispatcher who broadcast the alert. Lieutenant Bond's testimony did not specify what kind of jewelry was involved, its description, or even that a report of stolen jewelry had been received by the police, let alone a report matching anything published in the radio dispatch. He acknowledged that it is customary for people to pawn or sell articles of personal property such as jewelry, and that he could not look at an item of jewelry and determine whether it appeared to be stolen. Bond gave no testimony about any behavior mentioned in the dispatch to justify a suspicion that the persons attempting to sell the jewelry had stolen it. Nevertheless, he stopped a yellow Toyota pickup truck with appellant (a black woman) as its passenger and Lewis Petter (a white man) as its driver.

After stopping the vehicle, Bond noticed a ring box on the front seat of the vehicle; he spoke with Petter about the ring box and the jewelry. Officer Mark Rodenberry then arrived, and frisked Petter and appellant for weapons. During that search, he found a small purse belonging to appellant. A rock of cocaine was inside the purse. Appellant was then arrested. Rodenberry testified at the suppression hearing that, although he was at the stop site for more than twenty minutes, he did not recover any jewelry. The record contains no proof that any jewelry had ever been stolen. None of the police officers who testified at the suppression hearing witnessed a moving traffic violation or any other suspicious activity by appellant, her associate, or the vehicle in which she was a passenger before the stop occurred.

Our standard of review requires that we make an independent determination, based on the totality of the circumstances, in reaching our decision whether evidence obtained by means of a warrant-

less seizure should be suppressed. Under that standard, the trial court's finding is not set aside unless it is found to be clearly against the preponderance of the evidence. *State* v. *Osborn*, 263 Ark. 554, 556 S.W.2d 139 (1978).

The Fourth Amendment to the Constitution of the United States protects the right of people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures. Pursuant to the holding by the Supreme Court of the United States in *Terry* v. *Ohio*, 392 U.S. 1 (1968), police may stop persons without probable cause under limited circumstances. Nevertheless, it is clear that stopping a vehicle and detaining its occupants constitutes a seizure within the meaning of the Fourth Amendment. *See Delaware* v. *Prouse*, 440 U.S. 648 (1979). In *Hill* v. *State*, 275 Ark. 71, 628 S.W.2d 284, *cert. denied*, 459 U.S. 882 (1982), the Arkansas Supreme Court stated that the justification for an investigative stop depends upon whether, under the totality of the circumstances, the police have specific, particularized and articulable reasons indicating that the person or vehicle may be involved in criminal activity. That standard is also codified at Rule 3.1 of the Arkansas Rules of Criminal Procedure which states:

> A law enforcement officer lawfully present in any place may, in the performance of his duties, stop and detain any person who he reasonably suspects is committing, has committed, or is about to commit (1) a felony, or (2) a misdemeanor involving danger of forcible injury to persons or of appropriation of or damage to property, if such action is reasonably necessary either to obtain or verify the identification of the person or to determine the lawfulness of his conduct.

Rule 2.1 of the Rules of Criminal Procedure contains the definition of "reasonable suspicion," and states:

> "Reasonable suspicion" means a suspicion based on facts or circumstances which of themselves do not give rise to the probable cause requisite to justify a lawful arrest, but which give rise to more than a bare suspicion; that is, a suspicion that is reasonable as opposed to an imaginary or purely conjectural suspicion.

In the comment to Rule 2.1, the following factors are listed for determining whether a "reasonable suspicion" exists: (1) The con-

duct and demeanor of a person; (2) the gait and manner of a person; (3) any knowledge the officer may have of a person's background or character; (4) whether a person is carrying anything, and what he is carrying; (5) the manner of a person's dress, including bulges in his clothing, when considered in light of all the other factors; (6) the time of the day or night; (7) any overheard conversation of a person; (8) the particular streets and areas involved; (9) any information received from a third person, whether that person is known or unknown; (10) whether a person is consorting with others whose conduct is "reasonably suspect"; (11) a person's proximity to known criminal conduct; (12) the incidence of crime in the immediate neighborhood; (13) a person's apparent effort to conceal an article; and (14) the apparent effort of a person to avoid identification or confrontation by the police. When these fourteen factors are applied to this case, it becomes obvious that none of them are met and that there is no basis for sustaining the trial court's finding that the police had a reasonable suspicion for stopping the vehicle and then detaining the appellant.

The record contains no proof that appellant's conduct and demeanor was suspicious at any time before the stop took place. Although Lieutenant Bond and Officer Rodenberry testified that they took their actions in stopping and searching appellant based upon the radio dispatch about a black female and a white male who were riding in a Toyota pickup truck and attempting to sell some possibly stolen jewelry, that broadcast did not indicate that any jewelry had been reported as stolen, or even that any jewelry had been identified as missing. There is nothing criminal about trying to sell jewelry at a pawn shop, riding in a Toyota pickup, or associating with white males. All of those activities are manifestly legal. Even the State does not advance the obviously absurd argument that trying to sell jewelry that nobody has reported as stolen is a crime. Jewelry that has not been stolen can be bought and sold without permission from the police or anybody else.

The record contains no proof that the radio broadcast upon which Lieutenant Bond based his investigatory stop described the gait and manner of appellant, her associate, or anyone else at any time whatsoever, and especially at a time relevant to suspecting that somebody was trying to sell anything stolen. Although Bond testified at the suppression hearing that he had encountered appellant on other occasions, he also testified that he did not recognize her

before he stopped the vehicle. Plainly, the second and third factors for determining reasonable suspicion were not met.

Bond and Rodenberry testified that the radio broadcast indicated that a black female and a white male were trying to sell "possibly stolen jewelry." The fourth factor in determining reasonable suspicion (whether a person is carrying anything, and what she is carrying) was not satisfied by that report. At most, the report that people were trying to sell "possibly stolen jewelry" meant that whoever made the report should have been interviewed by the police to determine whether there was reason to suspect that anything had been stolen. After all, "possibly stolen jewelry" means that the jewelry was possibly not stolen at all. Because the record contains no proof that anybody had reported the theft of any jewelry, the total absence of data on this factor could not have produced a "reasonable suspicion." At most, the broadcasted report amounted to the kind of "bare suspicion . . . [and] imaginary or purely conjectural suspicion" that is expressly disfavored in Rule 2.1.

The radio broadcast provided no information to the police regarding the manner of dress of either the white male or the black female, and Lieutenant Bond witnessed nothing about the dress or clothing of appellant or her associate that was suspicious before he stopped the vehicle. There is nothing in the record indicating what time or day that the broadcast was sent, when the information upon which the broadcast was issued first became known to the police, or even what time appellant was stopped. Thus, factors six and seven were not met.

Even if one takes the unwarranted view that the radio dispatch was an overheard conversation within the meaning of the eighth factor for determining reasonable suspicion in Rule 2.1, it remains clear that the dispatch provided no information of suspicious conduct or activity. Again, trying to sell jewelry at a pawn shop (the conduct that was reported during the dispatch) is not a crime in Hot Springs, nor is it criminal for black females to try to sell jewelry, to accompany white males who try to sell jewelry, or to ride in yellow Toyota pickups with white males while attempting to sell jewelry.

The record does not show that the radio dispatch indicated what streets and areas of town were involved in the supposedly

suspicious activity. The record does not specify anything about the information provided by third persons suggesting that those persons observed criminal activity. One would think that if the information upon which the police relied to issue the dispatch leading to the investigatory stop had been specific and had articulated reasons for believing that criminal activity was occurring some place, the police officers who made the stop would have testified about it. To the contrary, three police officers testified that they did not hear the radio broadcast at all (Detective Michael Gregor, Investigator Michael Wright, and Officer Rodenberry). Although Lieutenant Bond testified that his "understanding" was that appellant and her associate had been to Monty's Pawn Shop and tried to sell some jewelry that appeared to have been stolen, he admitted that the radio dispatcher did not indicate that Monty's Pawn Shop was the source of the report or the site where the alleged attempted sale took place. The basis of Bond's "understanding" remains a mystery. None of the officers testified concerning information from third persons that indicated that anybody had knowledge about a past, present, or potential jewelry crime anywhere. Clearly, factors nine and ten were not met.

The tenth factor listed in the comment to Rule 2.1 is whether a person is consorting with others whose conduct is "reasonably suspect." None of the police officers who testified at the suppression hearing indicated that there was anything suspicious about appellant's association with Lewis Petter. Of course, the radio broadcast that prompted Lieutenant Bond to stop and detain appellant and Petter did not identify anybody by name, at least as far as can be determined from the record. Nobody testified that there is a suggestion of criminality whenever unidentified black females are in the company of unidentified white males, or that criminality is suggested by the fact that white males try to sell jewelry while accompanied by black females.

The eleventh factor among those listed in the comment to Rule 2.1 involves a person's proximity to *known criminal conduct*. There was no known criminal conduct involved at the moment of the stop. Indeed, the dispatch characterized the jewelry as "possibly stolen," demonstrating that the nature of appellant's conduct was uncertain in the mind of the unidentified police informant. The record does not contain any proof about the incidence of crime in the neighborhood (factor twelve) because the record does not show

where the supposed effort to sell "possibly stolen" jewelry occurred. Nobody saw appellant or Petter try to conceal anything, and the radio broadcast apparently did not indicate that anyone else had tried to conceal anything (factor thirteen). There was no effort, apparent or otherwise, by appellant or Petter to avoid identification or confrontation by the police (factor fourteen).

It is obvious that none of the factors that are recognized as relevant to determining whether a "reasonable suspicion" exists were present in this case. Appellant and her associate were stopped by Lieutenant Bond and searched by Officer Rodenberry based upon nothing more than the broadcast radio report of a naked suspicion that a white male and a black female had been attempting to sell undescribed jewelry that "possibly" was stolen. Nobody investigated whether the report was valid. Nobody investigated whether anything had been stolen. The record does not indicate whether the jewelry was described during the radio broadcast so that officers in the field would have been able to make a rational judgment about stopping and detaining people who had jewelry in their possession based on the description given. Somebody known to nobody identified in this record apparently contacted the police and shared the suspicion that a white male and a black female were trying to sell to a pawn shop jewelry that was never described and possibly was stolen. If that is not a "bare suspicion" and "an imaginary or purely conjectural suspicion," neither the State nor the majority have offered the slightest explanation how it could be more naked, or what factor(s) provide the covering for its nakedness.

*Nottingham* v. *State*, 29 Ark. App. 95, 778 S.W.2d 629 (1989), involved a telephoned report by a store owner to a police officer about a possible DWI suspect. The officer went to the location given him by the store owner and observed a vehicle that matched the description given him. The officer observed the vehicle parked in a place that was not normally used by the public, its motor was running, and its occupant appeared to be asleep. The officer observed a beer can positioned between the occupant's legs. The officer was unable to rouse the occupant of the vehicle by tapping on the window of the vehicle. We held, in an opinion authored by Judge Rogers, that "the report from the store owner, *combined with independent observations made by the officer*, clearly constituted reasonable suspicion" that the appellant in that case was involved in

criminal activity. 29 Ark. App. at 101, 778 S.W.2d 632 (emphasis added). In this case, neither the unidentified person whose report to the police prompted the radio broadcast nor anybody else observed facts to create anything beyond the bare suspicion that appellant, her associate, or anyone else was involved in criminal activity.

In *Leopold v. State*, 15 Ark. App. 292, 692 S.W.2d 780 (1985), we held that reasonable suspicion was established for an investigatory stop of a vehicle that police officers spotted travelling on a private road at 2:00 a.m. some four to six miles off a main highway and at about ten miles an hour. The officers testified that there had been complaints in the area of people spotlighting or night hunting, of things being stolen, and that people had been growing marijuana in the area. Based upon the suspicion that the occupants of the vehicle were spotlighting for deer, their vehicle was stopped. Of course, night hunting, spotlighting, theft of property, and growing marijuana are criminal offenses and in *Leopold*, the police actually observed the suspicious activity. Moreover, the police had received reports that property had actually been stolen. Here, nobody reported that anything had been stolen, or that anything else defined as criminal had occurred.

Contrary to the suggestion in the majority opinion, this case does not involve an investigatory stop based on direct information of criminal conduct by someone known by the police to have a history of felonious conduct. *Johnson v. State*, 319 Ark. 78, 889 S.W.2d 764 (1994), was a case involving an investigatory stop by a police officer after the Fort Smith Police Department received an anonymous call that two people were in a specified motel room selling illegal drugs and using a blue van to make deliveries. The officer knew the appellant to have previous drug arrests and convictions. He saw the appellant leave the motel room and drive off in the blue van. He had received direct and unequivocal information that the appellant was engaged in conduct that is clearly criminal. Here, although Lieutenant Bond knew appellant, he testified that he did not know that she was in the pickup until he stopped it. There is no proof that anyone had done anything illegal, let alone proof of direct information to that effect.

No proof remotely similar to that found to support the investigatory stops in the cases cited by the majority exists in this case. Reasonable suspicion was found in those cases because the conduct observed by the police and reported by others fit the definition of

crimes, whether the police knew the persons stopped were engaged in criminal activity or not. Yet it is a far different matter for the police to seize a person without even a report or observation that the person is engaged in conduct that can be called criminal. As previously mentioned, trying to sell jewelry is not a crime. Nobody reported that persons were committing a crime as in *Johnson* v. *State*. There is no report that thefts had occurred as was the case in *Leopold* v. *State*. The police did not observe appellant doing anything that could be characterized as suspicious as in *Nottingham*. This case did not involve observations by the police of conduct suggestive of preparations for an eventual crime, as when an officer observed three men who appeared to be conducting surveillance of a store in preparation for a robbery. *Terry* v. *Ohio, supra*. In each of those cases there were specific, particularized and articulated facts that created the reasonable suspicion on the part of the police. Likewise, in *Brooks* v. *State*, 40 Ark. App. 208, 845 S.W.2d 530 (1993), we upheld an investigatory stop as based upon reasonable suspicion where a citizen had spoken face to face with a police officer and had related criminal activity (smoking crack cocaine in a car) that he (the citizen) had observed.

In *Kaiser* v. *State*, 296 Ark. 125, 752 S.W.2d 271 (1988), our Supreme Court reversed a drug conviction upon a challenge to an investigatory stop based upon information supplied to the Arkansas State Police by the Missouri State Police who were, in turn, acting upon a confidential informant that the Missouri State Police deemed reliable. The Supreme Court reversed the conviction, despite the fact that certain aspects of the information relied upon by the Arkansas State Police matched that supplied by the Missouri officers, holding that because the record was devoid of testimony showing why the Missouri police deemed their informant reliable, there was insufficient proof to establish that the Arkansas police had a reasonable suspicion for the stop. In the present case, the record is inadequate concerning the source of the information upon which the radio broadcast was based. The police apparently did not know the source, let alone know if it was reliable. Nor did they know any of the details that led the informant to conclude that the ring was "possibly stolen." In short, the record before us falls well below the quantum of evidence that the court found "devoid of testimony" to support reasonable suspicion in *Kaiser*. 296 Ark. at 125, 752 S.W.2d at 274.

Likewise, in *Van Patten v. State*, 16 Ark. App. 83, 697 S.W.2d .919 (1985), we reversed and dismissed a conviction for driving while intoxicated, holding that the police stopped the appellant without reasonable suspicion so that the trial court should have suppressed all evidence of the DWI. In writing for the majority in that case, Judge Cloninger stated:

> [W]e do not think Officer Tindle had specific, particular or articulable reasons to suspect that a felony or a misdemeanor involving danger of injury to persons or property had been committed. The radio dispatch that he received was anonymous and it gave extremely general information about a "loud party" and a "brown Jeep." *The officer did not investigate or confirm the complaint before stopping appellant, so he had no reason to suspect that a misdemeanor involving personal [injury] or property damage had been committed by the occupant.* 16 Ark. App. at 86, 697 S.W.2d at 921 (Emphasis added).

The same error occurred in this case. Lieutenant Bond did not investigate or confirm the apparently unverified complaint that a white male and a black female were trying to sell possibly stolen jewelry. He was operating upon an unconfirmed and uninvestigated suspicion that jewelry possibly had been stolen, having no information concerning the description of the jewelry, the identity of the person suspecting that the jewelry possibly was stolen, or that any jewelry had been reported stolen that might have remotely matched the unprovided description of the jewelry that the two people were trying to sell. However, rather than using the phoned report as the basis for investigating the complaint in order to determine if a reasonable basis for suspecting that anything criminal had occurred, the police jumped to the conclusion that two people were suspected of trying to sell stolen jewelry when nobody had confirmed that anything was stolen. Bond testified that he stopped the vehicle to check for the jewelry based upon the information obtained from the radio dispatch that was, in turn, based upon information obtained from somebody else. No supporting facts for the suspicion reported to the police appear in the record. The identity, reliability, or even the existence of the person whose suspicion prompted the radio dispatch cannot be found in the record.

Despite the absence of anything close to an allegation or report of suspected criminal activity and substantiation for the suspicion that anybody had done anything illegal, appellant, her associate, and

the vehicle in which they were riding were seized within the meaning of the Fourth Amendment which protects against unreasonable seizures. The seizure was anything but consistent with good or effective investigatory techniques. As Sherlock Holmes told Dr. Watson, without data, the mind insensibly begins to twist facts to suit theories instead of twisting theories to suit facts. Investigation is the process by which law enforcement agencies and personnel collect the data upon which reasonable suspicion must ultimately rest. Otherwise, law enforcement will amount to little more than rumor-chasing, as was plainly the case in this instance. The police in this case knew only that an informant had supplied general information about a "possible" crime. Lieutenant Bond's testimony proves that he did not know the source of that information. Lieutenant Bond's testimony was that some — though not all — pawn brokers were reliable informants. No proof adduced at trial indicated whether this informant, if a pawn broker at all, was one of the reliable ones or not. The police. also did not know why their unidentified and apparently unknown informant believed that anything was "possibly stolen." They never produced a description of the object that their informant reported as having been "possibly stolen." They clearly lacked these vital facts essential to support a reasonable suspicion that a jewelry theft had occurred when the radio dispatch was issued and when Lieutenant Bond made the investigatory stop.

The Fourth Amendment was placed in the Constitution of the United States so that the liberty of persons and their property to exist and move would not be curtailed by such a cavalier approach to law enforcement. If the police do not know enough to tell whether a theft has been reported, how can they know that they are stopping a suspected thief? If they do not have a description of stolen goods, how can they reasonably suspect that a person may possess them? If the police are unwilling or unable to determine whether a theft occurred, and (if so) the description of what was allegedly stolen (rather than "possibly stolen"), why should they be authorized to interfere with the right of persons to go about their affairs? If the police are unwilling to investigate at all to determine whether there is reason to suspect a crime, why should they be allowed to stop people on a bare suspicion under the guise of investigating a reported crime when, in fact, they are chasing the rumor of a reported non-crime? Neither the State nor the majority opinion answers these obvious questions that underlie our Fourth

Amendment freedom from unreasonable seizure. Instead, the result today upholds a patently unreasonable seizure upon the naked "say so" of an unidentified informant whose reliability is unknown and who provided information that is neither specific, particularized, nor articulable as the law requires.

Given the total absence of proof to establish a reasonable suspicion in this case and my view that the police conduct challenged here amounted to what can best be termed "active ignorance," to use the words of Goethe, certain questions can reasonably be raised that, while uncomfortable, are nonetheless relevant to the larger question of the proper limits of law enforcement in our society. One wonders whether the police would have been so cavalier about investigating the unsubstantiated report of "possibly stolen" jewelry if the report had not mentioned that a white male and a black female were attempting to sell "possibly stolen" jewelry. Could the oft-reported and documented tension and suspicion by minority citizens and their neighborhoods toward the police be based on similar incidents of police "investigations" founded upon the naked suspicion of a store owner who may have disapproved of the race of a person? See Terry v. Ohio, 392 U.S. 1, 14 n.11 (1967). One wonders whether the police would have been as quick to accept the unidentified informant's mere suspicion that a crime had "possibly" occurred and that appellant was a likely suspect if she had been identified as a white female, or a white male, or tastefully dressed, or driving a Mercedes sedan rather than a Toyota pickup.

Perhaps the police would have been equally slipshod in their "investigatory" approach in any case. Perhaps not. Nevertheless, it is understandable that the police are viewed with distrust and hostility in certain quarters of society (including minority communities but by no means limited to them) when the police stop people and frisk them based on nothing but an unverified and unreliable suspicion from some unidentified person. It is understandable that persons who have been subjected to such "investigatory" conduct view the police as an armed occupation force employed to harass the less-favored and disfavored on behalf of a privileged class, rather than a fair-minded and even-handed agency engaged in the honest and diligent effort of criminal investigation and law enforcement for the whole society. This is an unpleasant train of thought, to be sure, but it is an undeniable reality against which the Fourth Amendment requirement of "reasonable suspicion" is intended. In light of the

majority's conclusion that a suspicion wholly lacking in factual support is deemed "reasonable," the wonder is not that the police are viewed with distrust and resentment by some communities, but that there is as much cooperation as currently exists for their efforts in *all* communities. Our decision today will not help matters.

I respectfully dissent from the unfortunate result reached in this case. This case highlights the difference between proper deference to legitimate police investigatory actions and acquiescence by trial and appellate judges to patently unreasonable police conduct. Sadly, I predict that our decision will hinder law enforcement efforts by further alienating the police from the people they are supposed to protect and serve as those people will conclude that the right to be left alone is not one that the police are obligated to respect.