RENDERED:  AUGUST 21, 2020; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-000641-MR

LONNELL DEMETRIUS EMBRY                                APPELLANT


APPEAL FROM FAYETTE CIRCUIT COURT
v.        HONORABLE KIMBERLY N. BUNNELL, JUDGE
ACTION NO. 18-CR-01270


COMMONWEALTH OF KENTUCKY                              APPELLEE


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  COMBS, GOODWINE, AND LAMBERT, JUDGES.

COMBS, JUDGE:  In this criminal case, Lonnell Demetrius Embry (Embry), the

Appellant, appeals the trial court's denial of his motion to suppress.  After our

review, we affirm.

On October 29, 2018, Embry was indicted by a Fayette County grand

jury and was charged with the following offenses:  on or about **June 4, 2018 --**

wanton endangerment, first degree, and fleeing or evading police, first degree (motor vehicle); on or about **June 22, 2018** -- trafficking in controlled substance, first offense (heroin); trafficking in a controlled substance, first degree, first offense (less than 4 grams cocaine); tampering with physical evidence; and possession of drug paraphernalia. In addition, Embry was charged with being a persistent felony offender (PFO), first degree.

On January 2, 2019, defense counsel filed a motion to suppress, arguing that evidence seized as a result of a June 22, 2018, traffic stop should be suppressed:

> The defendant was driving a vehicle that was stopped because he was allegedly the person who had fled from the police on June 4, 2018 in a different area of town. The police lacked reasonable suspicion that the drive[r] of the vehicle on June 22 was the same person involved in the attempted stop on June 4, 2018.

On January 14, 2019, the trial court conducted a hearing on the suppression motion. The Commonwealth called Joshua Thomas, a patrol officer with the Lexington Police Department, as its sole witness. Officer Thomas testified that on June 4, 2018, he and Officer Simpson were dispatched to the White Castle on New Circle Road in Lexington in response to a complaint that someone in a small, burnt-orange vehicle was possibly selling narcotics. When they arrived, a vehicle matching the same description -- a Hyundai with a Georgia license plate -- was in the parking lot. Officer Thomas observed the vehicle backing out of the

parking spot, walked up to it, and had the vehicle pull back into the spot. Officer Thomas believed that he had activated his body cam but it did not record. The police obtained a surveillance video (without audio) from the White Castle showing the driver's side of the vehicle; that video was played during the hearing. Officer Thomas testified that he could smell the odor of marijuana coming from the vehicle. He spoke to the driver -- Embry -- for about two minutes. Embry accused Officer Thomas of harassing him. Officer Thomas asked Embry to turn off the vehicle, which was still in drive, probably six or seven times and told him to step out of the car. Embry refused. Instead, he put the car in reverse and drove off. Officer Thomas and Officer Simpson had to get out of the way in order to avoid injury. A short time later, the unoccupied vehicle was found nearby, legally parked and unlocked.

A witness reported having seen the driver exit, take off his shirt, and run. Officer Thomas testified that they were not able to locate anyone at the time. The vehicle was searched due to the smell of marijuana, but it was not watched overnight. The next day, it was gone. Officer Thomas testified that the license plate came back registered to an older woman in Georgia. He attempted to contact her -- but unsuccessfully.

Eighteen days later, on June 22, 2018, shortly after midnight, Officer Thomas was on Richmond Road when he recognized the orange Hyundai from the

earlier incident passing him. Officer Thomas sent the Georgia plate number to dispatch, which confirmed that it was the same vehicle. The Hyundai immediately turned into the City Barbeque parking lot, and Officer Thomas pulled in behind it. The driver rolled the window down. Officer Thomas testified that he recognized Embry immediately, that he was "100% sure." Officer Thomas inquired if everything was all right, noting that the occupants of the vehicle were from Georgia. The driver stated that they were fine and that they were looking for "the chicken place." Embry pulled away. Officer Thomas did not initiate a stop at that point because he wanted to call for some officers to assist. He knew that Embry had fled from officers previously; he hoped to avoid a vehicle pursuit, waiting to see if Embry would stop at the chicken place.

However, Embry made no effort to stop at the restaurant, which was closed, and instead he drove at a high speed to Cove Run Apartments. He pulled into a handicap spot. Officer Thomas testified that he activated his lights when he came into the apartment complex. Embry was exiting the vehicle. Two females were already outside the vehicle and were going into the apartments. Officer Thomas made contact with Embry once he was out of the vehicle and let him know that he was being detained for investigation. Other officers arrived on the scene. Embry was detained at his vehicle and was then escorted to Officer Strong's patrol vehicle.

Officer Thomas testified that Officer Strong took custody of Embry and took him to the back of his patrol vehicle. Officer Thomas went to speak to another officer. Officer Strong observed baggies of narcotics (heroin) strewn on the ground behind the car.

Officer Strong then *Mirandized*[1] Embry. Officer Thomas testified that prior to that point, both officers had been next to the patrol car and that nothing was on the ground.[2] Another officer searched Embry and located possible cocaine on his person. After narcotics were found on Embry's person as well as on the ground, Officer Thomas searched the vehicle, where he found baking soda, Epsom salts, a container of an unknown substance, measuring instruments with a white powdery residue, and more white residue on the floorboard.

Officer Thomas testified that he stopped Embry in the apartment parking lot based on having had prior contact with the vehicle on June 4; that Embry had fled from Officer Thomas; and that when he made contact with the vehicle again on June 18, he identified that its driver was Embry. The court asked why Officer Thomas didn't arrest him sooner. Officer Thomas explained he had been a relatively new officer at the time and was a little "worked up."

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

[2] Body cam video played at the hearing showed the area with the baggies on the ground; those baggies had not been present in the same area on earlier footage.

Defense counsel argued that the evidence from the stop should be suppressed because there was not a definite identification that this was the person who had fled the scene on June 4, that he was not ordered to stop during the first contact earlier that evening when they discussed "the chicken place," that there was no reason to stop him later at the apartment complex, and that the search of the vehicle was improper.

Ruling from the bench, the trial court found that the officers did exactly what they were supposed to do when they received the dispatch at the time of the June 4 incident at the White Castle, which the trial court characterized as "a nice voluntary encounter." Additionally, they had the license plate and vehicle description, they talked to the occupants, and they smelled the marijuana, entitling them to search the vehicle at that time. The trial court further found that the driver made the decision to take off, to flee, and to escape custody on June 4.

The trial court further found that 18 days later, the officer saw that same vehicle and confirmed that it had the exact same license plate. The court explained that the officer again did exactly what he was supposed to do: that he confirmed the identity of the driver – and that he was 100% sure that it was Embry. When Embry pulled into the apartment complex, "he is stopped because he is the guy from the previous . . . there's no doubt." Although Embry was detained, "he could have been arrested right then, right there." The court explained that after

Embry was detained, "we have the dropping of the items" on the ground; it was not disputed that they had not been there -- and then suddenly they were. Furthermore, Embry was going to be charged and arrested for those baggies on the ground; a search revealed drugs on his person -- also grounds for arrest. The court determined that the police had ample authority to enter into the car without Embry's permission based on all the information that they had going back to June 4, 2018, and that the search was also proper as an incident to the arrest on June 22.

On January 14, 2019, the trial court rendered a written order denying the motion "for reasons stated on the record."

The trial court's judgment of March 13, 2019, reflects that Embry entered a conditional guilty plea on March 8, 2019, to the crime of "Ct. 1, Amended: Possession of a Controlled Substance, 1st Offense, Heroin"; and an *Alford*[3] plea to the crimes of:

> Ct. 2 Trafficking in a Controlled Substance, 1st Degree, 1st Offense, Less Than 4 Grams of Cocaine, Ct. 3 Amended: Criminal Attempt to Wit: Tampering with Physical Evidence, Ct. 4 Amended: Wanton Endangerment, 2nd Degree, Ct. 5 Amended: Wanton Endangerment 2nd Degree and Ct. 6 Possession of Drug Paraphernalia.

The PFO charge was dismissed, and Embry reserved the right to appeal the denial of his motion to suppress.

---

[3] *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).

On April 2, 2019, the trial court entered its final judgment and sentenced Embry to a total of four years to serve.

On April 23, 2019, Embry filed a notice of appeal to this Court. On appeal, he contends that the trial court erred in denying his suppression motion. His primary argument is that there was no reason to stop him on June 22 because he had not been seized and that he had been free to leave on June 4, 2018. He also contends that a warrant should have been obtained to search the vehicle on June 22, because he was not in or near the vehicle at the time of the search, and that, therefore, the trafficking charges should be dismissed because they arose from an impermissible search of the vehicle. The issues are sufficiently preserved for our review.

In *Fletcher v. Commonwealth*, 182 S.W.3d 556 (Ky. App. 2005), this Court analyzed the criteria underlying the reasonableness of stops and detentions by the police:

> As we observed in *Baltimore v. Commonwealth*, 119 S.W.3d 532, 537 (2003), there are three types of interaction between the police and citizens: consensual encounters, temporary detentions (generally referred to as *Terry* stops), and arrests. The prohibition against unreasonable search and seizure provided by the Fourth and Fourteenth Amendments to the United States Constitution applies only to *Terry* stops and arrests. *Id.* The Fourth Amendment dictates that an official detention of a person must be supported by probable cause—even if no formal arrest of the person is made. *Id.* However, the courts have recognized several limited exceptions

based upon the nature and extent of the intrusion and the government interest involved. *Id.*

In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the United States Supreme Court held that a brief investigative stop, detention, and frisk for weapons do not violate the Fourth Amendment as long as the initial stop was supported by **reasonable suspicion,** a far lighter standard than probable cause. *Id. Terry* recognized that there must be an actual "seizure" before the protections of the Fourth Amendment are triggered. *Id.* Pursuant to *Terry,* a police officer may approach a person, identify himself as a police officer, and ask a few questions without implicating the Fourth Amendment. *Id.* A "seizure" for Fourth Amendment purposes occurs only when an individual is detained under circumstances that would induce a reasonable person to believe that he or she is not at liberty to leave. *Id.* Police may make a *Terry* stop for investigative purposes if they have "a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony . . . ." *Id.* citing *United States v. Hensley*, 469 U.S. 221, 229, 105 S.Ct. 675, 680, 83 L.Ed.2d 604 (1985).

*Id.* at 559 (emphasis original).

In reviewing a trial court's denial of a motion to suppress, our standard of review is two-fold. "We review the trial court's factual findings for clear error, and deem [them] conclusive . . . if supported by substantial evidence. The trial court's application of the law to the facts we review de novo." *Williams v. Commonwealth*, 364 S.W.3d 65, 68 (Ky. 2011) (footnotes omitted).

In the case before us, the trial court's factual findings are supported by substantial evidence -- the uncontroverted testimony of Officer Thomas -- and they are conclusive. The court correctly applied the law to those facts.

Although the trial court characterized the start of the June 4, 2018, contact at White Castle as "a nice voluntary encounter," the nature of that encounter quickly changed. As the trial court found, the smell of marijuana coming from the car gave Officer Thomas the right to search the vehicle at that very time. "Once the officer smelled the marijuana coming from the car, he had probable cause to search the vehicle and all of its contents." *Greer v. Commonwealth*, 514 S.W.3d 566, 568 (Ky. App. 2017). Officer Thomas asked Embry *six or seven times* to turn off the vehicle and to step out of it. A reasonable person would have believed that he was *not* at liberty to leave under those circumstances. We agree with the trial court's determination that Embry escaped custody on June 4, 2018, and that he fled. Those actions provided a reasonable and articulable suspicion for Officer Thomas to detain him on June 22, 2018, when he later encountered him searching for "the chicken place."

The trial court concluded that the search of the vehicle was proper both under the automobile exception and as a search incident to arrest. We agree with its analysis. The automobile exception to the warrant requirement "permits an officer to search a legitimately stopped automobile where probable cause exists

- 10 -

that contraband or evidence of a crime may be in the vehicle." *Morton v. Commonwealth*, 232 S.W.3d 566, 569 (Ky. App. 2007). A search of the vehicle incident to arrest was also proper because it was reasonable to believe that the vehicle contained evidence of the narcotics for which Embry was being arrested. In *Owens v. Commonwealth*, 291 S.W.3d 704, 708 (Ky. 2009), our Supreme Court re-visited that rule expressed in *Arizona v. Gant*, 556 U.S. 332, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009), explaining that "'[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search **or** it is reasonable to believe the vehicle contains evidence of the offense of arrest.'" (citing *Gant*, 556 U.S. at 351, 129 S.Ct. at 1723) (emphasis added).

Although Embry was not in the car, the circumstances of his detention clearly identified that the car contained incriminating evidence.

We conclude that the search was proper. Therefore, we AFFIRM the trial court's denial of the motion to suppress.

ALL CONCUR.

- 11 -

BRIEFS FOR APPELLANT:

Roy Alyette Durham, II
Frankfort, Kentucky

BRIEF FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

James Havey
Assistant Attorney General
Frankfort, Kentucky