[Cite as *State v. Williams*, 2022-Ohio-603.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| --- | --- | --- |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No.    29912 |
| --- | --- |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| GREGORY WILLIAMS | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No.    CR 19 11 3881 |

## DECISION AND JOURNAL ENTRY

Dated: March 2, 2022

SUTTON, Judge.

{¶1}   Defendant-Appellant Gregory Williams appeals the judgment of the Summit County Court of Common Pleas.  For the reasons that follow, this Court affirms.

I.

**Relevant Background Information**

{¶2}   This appeal arises from an investigatory stop and subsequent search of Mr. Williams' vehicle which resulted in the discovery of a fentanyl-related compound.  Mr. Williams was indicted for: (1) trafficking in a fentanyl-related compound, pursuant to R.C. 2925.03(A)(2)(C)(9)(d), a felony of the third degree; (2) a forfeiture specification to Count 1, pursuant to R.C. 2941.1417(A), and (3) possession of a fentanyl-related compound, pursuant to R.C. 2925.11(A)(C)(11)(c), a felony of the third degree.  On August 3, 2020, the trial court denied Mr. Williams' motion to suppress, and he pleaded no contest on all counts while reserving his right to appeal the suppression issue.

{¶3}   Mr. Williams now appeals raising one assignment of error for our review.

II.

**Jurisdiction**

{¶4}   This Court is obligated to raise sua sponte questions related to our jurisdiction. *See Bender v. Summa Rehab Hospital, LLC,* 9th Dist. Summit No. 29865, 2021-Ohio-3809, ¶ 5, citing *The Whitaker-Merrell Co. v. Geupel Constr. Co., Inc.*, 29 Ohio St.2d 184, 186 (1972).  An appellate court has jurisdiction to hear appeals only from final orders or judgments.  *Id.*, citing Ohio Constitution, Article IV, Section 3(B)(2); R.C. 2501.02.  *See also Gen. Acc. Ins. Co. v. Ins. Co. of N. Am.*, 44 Ohio St.3d 17, 20 (1989).  "In the absence of a final appealable order, an appellate court must dismiss the appeal for lack of subject matter jurisdiction."  *Id.*, citing *Lava Landscaping, Inc. v. Rayco Mfg., Inc.*, 9th Dist. Medina No. 2930-M, 2000 WL 109108, *1 (Jan. 26, 2000); *Noble v. Colwell*, 44 Ohio St.3d 92, 94 (1989).

{¶5}   In the present matter, the trial court's Journal Entry indicated Mr. Williams pleaded no contest to: Count I, trafficking in a fentanyl-related compound, pursuant to R.C. 2925.03(A)(2)(C)(9)(d), a felony of the third degree; a forfeiture specification to Count 1, pursuant to R.C. 2941.1417(A); and Count 2, possession of a fentanyl-related compound, pursuant to R.C. 2925.11(A)(C)(11)(c), a felony of the third degree.  As such, the trial court sentenced Mr. Williams to two years of community control under Counts 1 and 2.  If, however, Mr. Williams violates the terms of community control, the trial court may: (1) impose a longer sentence of community control; (2) impose a more restrictive sanction; or (3) may impose a reserved prison sentence of thirty-six months, on Count 1, and thirty-six months, on Count 2, to run concurrently for a total of thirty-six months imprisonment.  The trial court also imposed a

mandatory fine of $5,000.00, on Count 1, but waived it because Mr. Williams was found to be indigent.

{¶6} Further, the trial court held the forfeiture specification to Count 1, in the amount of $623.00, in abeyance, stating: "[Mr. Williams] has notified the [c]ourt of his intention to appeal the [c]ourt's ruling on the motion to suppress and has reserved his appellate rights." It is because the trial court held the forfeiture specification to Count 1 in abeyance that we question our jurisdiction in this matter.

{¶7} In *State v. Baker*, 119 Ohio St.3d 197, 2008-Ohio-3330, paragraph one of the syllabus, the Supreme Court of Ohio held a judgment of conviction complies with Crim.R. 32(C) when it sets forth four essential elements. The Supreme Court of Ohio has since "clarified those elements to be (1) the fact of conviction, (2) the sentence, (3) the signature of the judge, and (4) entry on the journal by the clerk of courts." *State v. Harris*, 132 Ohio St.3d 318, 2012-Ohio-1908, ¶ 22, abrogated *by State v. Henderson*, 161 Ohio St.3d 285, 2020-Ohio-4784, for other reasons; *see also State v. Lester*, 130 Ohio St.3d 303, 2011-Ohio-5204, paragraph one of the syllabus, modifying *State v. Baker*. Moreover, "[i]f a judgment of conviction includes these substantive provisions, it is a final order subject to appeal under R.C. 2505.02." *Id*. at ¶ 23, citing *Lester* at ¶ 14. "In *Baker*, [the Supreme Court of Ohio] observed that the meaning of the substantive requirements could be determined by looking to the plain language of Crim.R. 32(C), [its] precedent, and any relevant statutes." *Id*., citing *Baker* at ¶ 11.

{¶8} The question then is whether the forfeiture specification, in this matter, "constitutes any of the substantive requirements necessary for compliance with Crim.R. 32(C)." *Id*. at ¶ 24. ("A judgment of conviction shall set forth the fact of conviction and the sentence. * *

\* The judge shall sign the judgment and the clerk shall enter it on the journal. A judgment is effective only when entered on the journal by the clerk." Crim.R. 32(C).).

{¶9} Indeed, "an order of forfeiture does not constitute a conviction." *Harris* at ¶ 25. "A 'conviction' is an 'act or process of judicially finding someone guilty of a crime[.]'" *Id*., citing *State v. Tuomala*, 104 Ohio St.3d 93, 2004-Ohio-6239, ¶ 14, quoting Black's Law Dictionary 335 (7th Ed. 1999). "An offense is defined when one or more sections of the Revised Code state a positive prohibition or enjoin a specific duty \* \* \*." *Id*., quoting R.C. 2901.03(B). Further, an order of forfeiture, pursuant to R.C. 2941.1417(A)[1], does not constitute a sentence or a sanction, in accordance with R.C. 2929.01(EE) and R.C. 2929.01(DD) respectively, because it is not a "penalty or combination of penalties imposed on a defendant as punishment for the offense he or she is found guilty of[.]" *Id*. at ¶ 28. Lastly, an order of forfeiture, pursuant to R.C. 2941.1417, "contemplates judicial action and additional considerations that extend beyond a defendant's criminal case." *Id*. at ¶ 33. *See* R.C. 2941.1417(B) (stating that: "[t]he trier of fact shall determine whether the property is subject to forfeiture.")

{¶10} Here, because Mr. Williams pleaded no contest to one count of trafficking in a fentanyl-related compound, in violation of R.C. 2925.03(A)(2)(C)(9)(d), and one count of possession of a fentanyl-related compound, in violation of R.C. 2925.11(A)(C)(11)(c), and neither statute required forfeiture to be included as a punishment for Mr. Williams' offenses, the

---

[1] R.C. 2941.1417(A) states, in relevant part: "[p]roperty is not subject to forfeiture in a criminal case unless the indictment, count in the indictment, or information charging the offense specifies, to the extent it is reasonably known at the time of filing, the nature and extent of the alleged offender's interest in the property, a description of the property, and, if the property is alleged to be an instrumentality, the alleged use or intended use of the property in the commission or facilitation of the offense."

trial court's decision to hold the forfeiture specification in abeyance does not divest this Court of jurisdiction to hear this appeal.

{¶11} Thus, we will now address Mr. Williams' sole assignment of error.

### ASSIGNMENT OF ERROR

**THE TRIAL COURT ERRED IN DENYING [MR. WILLIAMS'] MOTION TO SUPPRESS BASED ON THE TRIAL COURT'S MISAPPLICATION OF THE COLLECTIVE KNOWLEDGE DOCTRINE.**

{¶12} In his sole assignment of error, Mr. Williams argues the trial court erred in denying his motion to suppress. Specifically, Mr. Williams contends the trial court misapplied the collective knowledge doctrine because the State did not call the first responding officers as witnesses, and the trial court wrongly determined Detective J.R. possessed reasonable suspicion. For the following reasons, we disagree.

{¶13} The Supreme Court of Ohio has stated:

> Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.

(Citations omitted.) *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8.

{¶14} "The investigatory stop of an automobile is a seizure for purposes of the Fourth Amendment and, consequently, must be based on a law enforcement officer's reasonable suspicion 'that a motorist has committed, is committing, or is about to commit a crime.'" *State v. Iloba*, 9th Dist. Wayne No. 20AP0030, 2021-Ohio-3700, ¶ 8, quoting *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, ¶ 7 Typically, to justify an investigative stop, an officer must point to "'specific and articulable facts which, taken together with rational inferences from those facts,

reasonably warrant that intrusion.'" *Maumee v. Weisner*, 87 Ohio St.3d 295, 299 (1999), quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968).

{¶15} The collective knowledge doctrine, however, recognizes that "[a] police officer need not always have knowledge of the specific facts justifying a stop and may rely, therefore, upon a police dispatch or flyer." *Maumee* at 297, citing *United States v. Hensley*, 469 U.S. 221, 231 (1985). "[T]he admissibility of the evidence uncovered during such a stop does not rest upon whether the officers relying upon a dispatch or flyer 'were themselves aware of the specific facts which led their colleagues to seek their assistance.' It turns instead upon '*whether the officers who issued the flyer' or dispatch possessed reasonable suspicion to make the stop*." (Emphasis added.) *Maumee* at 297, quoting *Hensley* at 231; *see also State v. Muldrow*, 10th Dist. Franklin No. 15AP-1119, 2016-Ohio-4774, ¶ 18. "The crux, [therefore], of the collective knowledge doctrine is that knowledge of law enforcement officers is *imputed to other officers*." (Emphasis added.) *State v. Johnson*, 10th Dist. Franklin No. 16AP-689, 2017-Ohio-5527, ¶ 24, citing *Muldrow* at ¶ 18. "Under *Muldrow*, where an officer making an investigative stop relies solely on information provided in a dispatch, a *Terry* stop is constitutionally valid *provided the state demonstrates at a suppression hearing that the facts precipitating the dispatch justified a reasonable suspicion of criminal activity*." (Emphasis added.) *Id*., citing *Muldrow* at ¶ 21.

{¶16} Further, probable cause consists of "'a reasonable ground for belief of guilt.'" *State v. Moore*, 90 Ohio St.3d 47, 49 (2000), quoting *Carroll v. United States*, 267 U.S. 132, 161 (1925). "The smell of marijuana, alone, by a person qualified to recognize the odor, is sufficient to establish probable cause to conduct a search." *Id*. at syllabus.

{¶17} At the July 23, 2020 suppression hearing Detective J.R., with the Akron Police Department, testified he had been assigned to the Street Narcotics Uniform Detail ("SNUD

unit") for the past "[s]ix-plus years[.]" Detective J.R. further testified he is "currently assigned as an undercover; so [he is] assigned to plain clothes, unmarked car." Detective J.R. explained the SNUD unit receives complaints through e-mails, phone calls, patrol officers or "anybody within the department." The SNUD unit then "investigate those complaints, along with being out in the field," and investigate "any complaints or any drug activity that we see or patrol is involved in."

{¶18} On October 28, 2019, Detective J.R. recalled he was working a special detail, over a period-of-time, called a "Gun Reduction Detail" and wore plain clothes and drove an unmarked car. He responded to a situation "near McKinley and Bertha Avenues" after another undercover officer "spotted a car sitting, loitering; and another car pulled up." When Detective J.R. arrived on scene, he parked "probably a block, block and a half away." Detective J.R., while using binoculars, observed the cars facing opposite each other and a "gentleman standing * * * at the driver's door, the window" engaging in what he believed to be a "hand-to-hand drug transaction." Based upon his training and experience, Detective J.R. watched for "two people to bump hands or exchange something, other than just a handshake." Detective J.R. radioed out the information about witnessing a hand-to-hand drug transaction and continued watching as the individuals "were passing something around" and smoking what he believed to be marijuana. Detective J.R. testified, "I've seen it a million times." Detective J.R. then radioed out: "[t]hey're smoking weed."

{¶19} At that point, the unit supervisor responded on the radio: "[w]e have uniformed cruisers there, outside the area, out of the way." The supervisor then radioed the uniformed cruisers to "come in" and "investigate a stop on these guys, see what they're doing." Detective J.R. explained: "[w]ell, I radio everything out; and then the supervisor makes the decision for the

cars to come in. I don't actually tell the cars to move in. I just relay information." In order to maintain his confidential cover, Detective J.R. "[left] once the cruisers [came] in and [made] the stop." Based upon Detective J.R.'s observations of marijuana use and the hand-to-hand drug transaction, "the supervisor said: Hey, let's move in; let's get both cars stopped." On cross-examination, Detective J.R. further testified:

\* \* \*

Q. You said that you stayed on scene until * * * the takedown cars * * * come in and kind of start the official inquiry; is that correct?

A. Yes.

Q. Okay. So you saw the cars then converge, the police cars, that is, converge on * * * my client's car?

A. Yeah. I don't remember how many actually came. I just know when I saw them turn the corner and pull up * * * I turned and went the other way.

\* \* \*

Q. So the police cars get onto the street, and you notice that, because you know it's coming. You're expecting that.

A. Yes.

\* \* \*

{¶20} Officer Mike Deitrick, who is also employed with the Akron Police Department, responded to the incident at McKinley and Bertha Avenue on October 28, 2019, subsequent to hearing Detective J.R.'s radio dispatch about the suspected criminal activity. Officer Deitrick testified that Detective J.R. was in plain clothes and an unmarked car that evening, but Officer Deitrick "was in uniform" along with Sergeant Dugan in a marked cruiser. According to Officer Deitrick:

\* \* \*

[Detective J.R.] advised us that at McKinley and Bertha he observed some males, appeared to be smoking some marijuana.

Short time later then he observed a hand-to-hand transaction.

At that point, we were advised to move in on the vehicles and check the occupants, check what they were up to.

\* \* \*

Further, Officer Deitrick testified:

\* \* \*

Myself, our cruiser, and several other cruisers -- they were all marked cruisers in the area -- responded to the area.

When we pulled on scene, there's a maroon SUV on the east side of the street; and then there's another vehicle on the west side of the street with some occupants in it.

\* \* \*

Mr. Williams was standing at the back of the Ford SUV, talking with some detectives that were already on scene and officers that were already on scene.

There's some officers talking to a car that was on the west side of the street as well, occupants inside of there.

So I kind of stood in between both vehicles; and I stopped right in between them, which would put me at Mr. Williams' open driver's side door of the Ford SUV.

\* \* \*

Mr. Williams stated that \* \* \* we have consent to check his vehicle, saying there should be nothing illegal inside of it and that he has a \* \* \* medical marijuana card.

\* \* \*

When asked why the subject of marijuana came up, Officer Deitrick responded: "I could smell marijuana. And [] Detective [J.R.] stated it looked like some guys were smoking in the area[.]"

Officer Deitrick also clarified he smelled "burnt" marijuana, not "raw" marijuana. As Officer

Deitrick moved toward the vehicle, he "looked in the driver's door that was open, right next to [him], in the armrest, there's a little bowl in there, right * * * around the door handle. And in there [he] could see a clear plastic baggy containing * * * a grayish powdery substance." Officer Deitrick further testified the clear plastic baggy is "known to be packaging for narcotics, whether its fentanyl, heroin, cocaine." The contents of the baggy were field tested on the scene and "tested positive for fentanyl[.]"

{¶21} In its August 3, 2020 order denying Mr. Williams' motion to suppress, the trial court stated, in relevant part, that:

* * *

[Mr. Williams] moved to suppress the evidence seized in this case, asserting the police lacked reasonable suspicion to stop his vehicle; lacked probable cause to search the vehicle; lacked free and voluntary consent to search the vehicle; and in his post hearing brief, [Mr. Williams] [claimed] his motion to suppress should be granted because the State failed to establish the applicability of the common knowledge doctrine, and did not present testimony from any officers involved in the initial stop of [Mr. Williams].

* * *

[Mr. Williams'] argument that his motion to suppress should be granted based on the State's failure to produce testimony from an officer involved in initiating the stop of [Mr. Williams] is not well taken. The evidence revealed [Detective J.R.] used binoculars to observe [Mr. Williams] participate in a "hand to hand" transaction. According to his experience and training, a "hand to hand" transaction differs from a handshake and is indicative of a drug deal. His observation of individuals smoking from and passing a small cigarette object between them was consistent with marijuana smoking which he had seen "a million times." The detective radioed the information and uniformed officers responded to the scene based on his observations and interpretation of events. Based on the detective's observations, training and experience, considering the totality of the circumstances, the detective had reasonable suspicion to believe criminal activity was afoot. Under the "collective knowledge" doctrine, the detective's observations and reasonable suspicion of criminal activity is imputed to the officers responding to the detective's radioed relay.

* * *

In the case at bar, the only evidence presented regarding consent was Officer Deitrick's testimony that he heard general conversation between [Mr. Williams] and another officer, did not provide any details of the conversation, did not know if [Mr. Williams] was in handcuffs, but believed he was not. [Officer Deitrick] then overheard [Mr. Williams] tell officers: 1) they could search his vehicle; 2) there was nothing illegal in it; and[] 3) he had a medical marijuana card. The lack of evidence surrounding the circumstances leading up to [Mr. Williams'] consent precludes the [c]ourt from finding by clear and convincing evidence that [Mr. Williams'] consent was freely and voluntarily given. However, [Detective J.R.'s] observations and interpretation of events, given his training and experience, combined with [Officer Deitrick's] experience and detection of the odor of burnt marijuana from [Mr. Williams'] car, under the totality of the circumstances, establishes probable case for the detective and responding officers to believe the vehicle contained contraband and justified a search of the vehicle.

\* \* \*

Upon review of the record, the trial court's findings are supported by competent, credible evidence. We now turn to applying those findings to the legal standard.

### Application of Collective Knowledge Doctrine

{¶22} As indicated above, "where an officer making an investigative stop relies solely on information provided in a dispatch, a *Terry* stop is constitutionally valid provided the state demonstrates at a suppression hearing that the facts precipitating the dispatch justified a reasonable suspicion of criminal activity." *Johnson* at ¶ 24, citing *Muldrow* at ¶ 21. Further, "the admissibility of the evidence uncovered during such a stop does not rest upon whether the officers relying upon a dispatch or flyer 'were themselves aware of the specific facts which led their colleagues to seek their assistance.' It turns instead upon 'whether the officers who issued the flyer' or dispatch possessed reasonable suspicion to make the stop.'" (Emphasis omitted.) *Maumee* at 297, quoting *Hensley* at 231.

{¶23} Here, the record reveals Detective J.R. initially observed the criminal activity giving rise to the dispatch and *Terry* stop. As such, the constitutionality of the *Terry* stop rests solely upon Detective J.R.'s *own reasonable suspicion of criminal activity. See Maumee* at 297,

quoting *Hensley* at 231. Specifically, Detective J.R. communicated information to the SNUD unit, through a radio dispatch, regarding: (1) the description of Mr. Williams' vehicle and the location of the incident; (2) activity consistent with a hand-to-hand drug transaction; and (3) individuals smoking what appeared to be a marijuana cigarette. A SNUD unit supervisor then ordered marked cruisers to move in and further investigate the situation. Prior to leaving the scene, Detective J.R. personally observed the first marked cruisers move in on Mr. Williams' vehicle. As such, based upon Detective [J.R.'s] training and experience as a police officer for twenty-four years, as well as his work with the SNUD unit for six years in areas known for drug and gun activity, Detective J.R.'s dispatch to the SNUD unit, that he witnessed a hand-to-hand drug transaction and individuals smoking a marijuana cigarette, justified a reasonable suspicion of criminal activity, pursuant to the collective knowledge doctrine, for a constitutionally valid *Terr*y stop.

{¶24} In spite of Mr. Williams' argument to the contrary, the responding officers who initially stopped Mr. Williams' vehicle did not actually *need* to testify at the suppression hearing because reasonable suspicion was imputed to them, through the collective knowledge doctrine, from Detective J.R.'s personal observations. As previously indicated, Detective J.R.'s personal observations of a hand-to-hand drug transaction and other drug activity were dispatched out, over the radio, to the SNUD unit. Indeed, a radio dispatch, such as the one from Detective J.R. to the SNUD unit, is a reliable method of communication for police to use in an undercover situation. Further, based upon the supervisor's specific instructions "to move in on the vehicles and check the occupants," uniformed officers came onto the scene in marked cruisers to further investigate. Prior to leaving the area, Detective J.R. witnessed the first of these cruisers moving in to surround and stop Mr. Williams' vehicle.

{¶25} Additionally, Officer Deitrick, a responding officer with over twelve years' experience on the police force, testified he and several other marked cruisers responded to the area based upon Detective J.R.'s observations, which were relayed to the SNUD unit through radio communication, and the supervisor's instructions. *See State v. Mook*, 9th Dist. Wayne No. 97CA0069, 1998 WL 417461, at *3 (July 15, 1998) ("Reasonable suspicion may exist on the collective knowledge of the police when there is reliable communication between the officer supplying the information and the officer[s] acting on that information."); *see also State v. Muldrow*, 10th Dist. Franklin No. 17AP-393, 2017-Ohio-8839, ¶ 9, ("the trial court should not have focused on the fact that the officers conducting the stop did not testify because the salient issue was whether the officer who ordered the stop [] had the requisite level of reasonable suspicion.")

{¶26} Officer Deitrick also testified he personally smelled the odor of burnt marijuana coming from Mr. Williams' vehicle and saw a clear plastic baggy containing a grayish powdery substance through the open driver's car door. Based upon his own experience, Officer Deitrick was able to differentiate between burnt and raw marijuana and recognized the clear plastic baggy as packaging for narcotics such as fentanyl, heroin, or cocaine. As such, based upon the totality of the circumstances, Officer Deitrick had probable cause to search Mr. Williams' vehicle. *See Moore, supra,* at 49.

{¶27} Thus, because Detective J.R. had reasonable suspicion to conduct a constitutionally valid *Terry* stop, and *his* reasonable suspicion was imputed to the responding officers through the radio dispatch, the State met its burden. *See Maumee* at 297.

{¶28} Given the foregoing, this Court cannot say the trial court erred in denying Mr. Williams' motion to suppress.

{¶29} Mr. Williams' sole assignment of error is overruled.

III.

{¶30} For the foregoing reasons, Mr. Williams' assignment of error is overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

 

BETTY SUTTON
FOR THE COURT

HENSAL, P. J.
TEODOSIO, J.
CONCUR.

APPEARANCES:

WILLIAM NORMAN, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellee.